**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2008-CT-00695-SCT**

*DAVID JACKSON WILLIAMS*

*v.*

*STATE OF MISSISSIPPI*

**ON WRIT OF CERTIORARI**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/27/2007 |
| TRIAL JUDGE: | HON. ANDREW K. HOWORTH |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DAVID G. HILL |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JOHN R. HENRY, JR. |
| DISTRICT ATTORNEY: | BENJAMIN F. CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED  - 11/10/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, PRESIDING JUSTICE, FOR THE COURT:**

¶1.      David Jackson Williams was convicted of murder in the Lafayette County Circuit Court and sentenced to life imprisonment in the custody of the Mississippi Department of Corrections.  Williams appealed, and we assigned this case to the Court of Appeals. After the Court of Appeals affirmed the trial-court judgment, we granted Williams's petition for writ of certiorari. Finding error in the trial court's refusal to give an assisted-suicide instruction, we reverse the judgment of the Court of Appeals and the Lafayette County Circuit Court's judgment of conviction and sentence and remand this case to the trial court for a new trial.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2.     The following history is taken from the facts and trial-court proceedings as set out in the opinion of the Court of Appeals. ***Williams v. State***, 2009 WL 4808181 (Miss. Ct. App. Dec. 15, 2009), *reh'g denied* Apr. 20, 2010. This appeal centers on the untimely death of Demetria Bracey, who was a student at the University of Mississippi in Oxford.  The events that led to Bracey's death were set into motion when Bracey met Williams on the internet during January 2005.[1]  Shortly after they met, Bracey and Williams formed a romantic relationship.

¶3.     Bracey and Williams maintained their relationship throughout the early months of 2005.  However, during the summer of 2005, Bracey left the United States for an opportunity to study abroad in Paris, France.  Bracey and Williams broke up before she left and remained separated for the summer.  Sometime after Bracey returned to Oxford, she and Williams resumed their romantic relationship. The events central to this appeal occurred during the second week of November 2005.

¶4.     At the beginning of the week, Bracey uncharacteristically failed to report for band practice and failed to report for her duties as a dormitory resident advisor.  Later in the week, one of Bracey's close friends, Jessica Smith, became concerned for Bracey.  Smith called Williams on his cellular telephone and asked him whether he knew where she could find Bracey.  Williams reported that Bracey's father was dying and that Bracey had gone home

---

[1]Williams also was a student at the University of Mississippi.

to Jackson so that she could be with him. Smith was not able to reach Bracey on her cellular telephone, so she asked Williams for the telephone number of Bracey's father. However, Williams would not give Jessica a telephone number. Williams told Smith that Bracey's father would not want Williams to give out his telephone number.

¶5. Undeterred, Smith asked Williams whether he would set up a three-way conference call so she could at least speak to Bracey. Shortly afterward, Williams arranged a conference call, and Smith was able to talk to Bracey for a short period of time. According to Smith, Bracey had sounded as though she had been crying. Smith attributed Bracey's emotional state to her father's illness. However, Bracey was not at her father's house. She was not even in Jackson. Instead, Bracey was with Williams at his apartment in Oxford. She had been with Williams in his apartment since Sunday, November 6.

¶6. Sometime between late Thursday night, November 10, and early Friday morning, November 11, Bracey died in Williams's apartment after a kitchen knife penetrated her chest and punctured the right ventricle of her heart. Bracey and Williams were alone in his apartment at that time. During an interview with Oxford police officers, Williams claimed that Bracey had killed herself pursuant to a mutual suicide pact.

¶7. According to Williams, sometime between Thursday night and Friday morning, he and Bracey both went into one of his closets. During its case-in-chief, the prosecution introduced into evidence a transcript of Williams's interview with the police. In that interview, Williams claimed that he and Bracey each had consumed substantial amounts of

3

alcohol and that they each had swallowed ten Klonopin tablets.[2] Williams stated that Bracey had then stabbed herself with one of his kitchen knives.[3] Williams stated that he was supposed to stab himself at the same time. According to Williams, he tried to stab himself, but his knife did not go in far enough, and he lost consciousness because of the pain, as well as the alcohol and prescription drug he had consumed.

¶8.     Williams claimed that he regained consciousness a couple of hours later and discovered that Bracey was dead. Williams told authorities that he removed the knife from Bracey's chest and threw it across the room. Williams reported that he then attempted to kill himself again, but could not do so.

¶9.     Williams spent the next few days isolated in his apartment drinking beer, watching television, and playing video games.  According to Williams, he drank "a lot" during that time. Williams said he had hoped the alcohol would help him find the courage to kill himself. On Saturday, Williams ordered pizza, and around the same time, he received a notice that apartment inspectors would be visiting his apartment. Williams pushed Bracey's legs into his closet and covered her body with clothes. He slept in another closet so he would not easily be discovered if an inspector entered his apartment.

---

[2]Klonopin is the brand name for clonazepam, an anti-anxiety medication in the benzodiazepine family, the same family that includes diazepam (Valium), alorazikan (Xanax), lorazepam (Ativan), flurazepam (Dalmane), and others. http://www.medicinenet.com.

[3]An autopsy revealed that the kitchen knife had penetrated between five and six inches into Bracey's chest, which would have required "considerable" force.

¶10. On the following Tuesday, November 15, 2005, Williams decided to go to his parents' house in Olive Branch. Williams reportedly asked his parents what he should do. His parents consulted an attorney and subsequently contacted authorities and informed them that they should examine Williams's apartment. Williams's parents had him admitted to the Baptist-DeSoto Hospital in Southaven, Mississippi.

¶11. On November 15, Lieutenant Wes Hatcher of the Oxford Police Department was dispatched to Williams's apartment. Lieutenant Hatcher went inside Williams's apartment and discovered Bracey's body. Lieutenant Hatcher secured Williams's apartment so it could be examined by crime-scene investigators. Officers from the Oxford Police Department met with Williams the next day.

¶12. On November 16, 2005, Williams was released from the hospital. Two members of the Oxford Police Department drove Williams to Oxford. Williams and his attorney met with Investigator Jimmy Williams of the Oxford Police Department and Master Sergeant John Marsh of the Mississippi Highway Patrol's criminal investigation bureau. Williams agreed to be interviewed with his attorney present.

¶13. During the interview, Williams claimed that Bracey had killed herself. Williams stated that he and Bracey had made a suicide pact and that they had started discussing suicide during the summer.

¶14. Regarding the night that Bracey died, Williams, in his interview with law enforcement officials, presented the following version of events:

5

We had kind of talked about committing suicide together and stuff like that and we decided we were going to do it last week and she came over, it was Sunday. We just hung out together, didn't go to class, she didn't work, um and we just hung out for a couple of days and decided that we were going to do it that night and she, we both drank a lot and took some pills but it wouldn't help the pain, you know. And we decided to do it in the closet so it would take longer for people to find us if somebody showed up looking for us and we got knives and went in there and we decided to do it at the same time and mine didn't go as far in.

Williams also said:

I woke up later and saw that [Bracey] was already dead. And I got the knife out of her and checked if she was alive and she wasn't. I stabbed myself again with that knife and I just couldn't do it hard enough to make it work. The next few days I was drinking and trying to do it at every night but I couldn't do it.

¶15. Williams was indicted on March 2, 2006, by a Lafayette County grand jury on the sole charge of murder. He pleaded not guilty, and on September 24, 2007, he went to trial. The prosecution called nine witnesses. Three of those witnesses testified regarding Bracey's personality, Williams's personality, and the relationship between Bracey and Williams.

¶16. Smith testified regarding Bracey's personality, Bracey's relationship with Williams, and the events that had transpired during early November 2005. Bracey's mother, Glenda Hill, also testified regarding Bracey's personality and relationship with Williams. Enjoli Canankamp testified that, during the spring and early summer of 2005, she and Williams had dated "off and on." Canankamp also testified that she had spoken with Williams about Bracey's death. According to Canankamp, Williams had said that he and Bracey had a suicide pact.

6

¶17. The prosecution also called law enforcement witnesses who had participated in the investigation. Lieutenant Hatcher testified as to his participation in the investigation, as did Investigator Williams and Agent Marsh, who by this time had left the Mississippi Highway Patrol's criminal investigation bureau and had joined the Federal Bureau of Investigation. Dywana Broughton, an employee of the Mississippi Highway Patrol's criminal investigation bureau's crime-scene unit, testified that she had found twenty-three separate blood stains throughout Williams's apartment.

¶18. Dr. Steven Hayne, a forensic pathologist, also testified for the prosecution. Dr. Hayne testified that on November 16, 2005, some five days after Bracey's death, he performed an autopsy on Bracey. Dr. Hayne testified that, at the time he performed his autopsy, it was his belief that Bracey had been dead for approximately three days. According to Dr. Hayne, the cause of Bracey's death was the stab wound to her heart. Dr. Hayne testified that the manner of her death was homicide. Dr. Hayne likewise testified regarding why he did not believe that Bracey had committed suicide.

¶19. Dr. Hayne explained that he had found bruises on the sternocleidomastoid muscles in Bracey's neck, soft-tissue hemorrhaging in her neck, and bruising in the area of Bracey's larynx. Dr. Hayne opined that the injuries to Bracey's neck were consistent with strangulation that was not self-inflicted, but was sustained while she was alive. Dr. Hayne also found an abrasion on Bracey's right hand that he considered to be consistent with defensive posturing. Additionally, Dr. Hayne testified that "hesitation marks" sometimes are present when a person has committed suicide. "Hesitation marks" appear when one begins

7

to commit suicide with a sharp object, but then hesitates to actually make the mortal wound and instead slightly injures himself. Dr. Hayne said he had found no hesitation marks on Bracey's body. Finally, Dr. Hayne explained that it would take a "considerable" or "significant" amount of force to commit suicide by stabbing through the cartilaginous portion of the rib cage.

¶20. On cross-examination, Dr. Hayne testified that "hesitation marks" do not always appear when someone commits suicide with a sharp object. Additionally, he admitted that Bracey could have sustained the abrasion to her right hand in a number of ways other than defensive posturing. However, he opined that Bracey had sustained the abrasion shortly before her death.

¶21. The prosecution's final witness was Dr. Earnest Lykissi, an expert in the fields of clinical and forensic toxicology. Dr. Lykissi testified that, contrary to Williams's claim that Bracey had taken approximately ten Klonopin tablets before she died, no drugs were detected in Bracey's system. Dr. Lykissi testified that Bracey had a substantial amount of alcohol in her system. To be precise, Dr. Lykissi testified that Bracey's blood-alcohol content was .6 percent. Dr. Lykissi explained that, when a person has a blood-alcohol content of .2, he or she is "commode hugging, floor crawling drunk." He further explained that someone with a blood-alcohol content of .3 is likely to be unconscious, and a person with a blood-alcohol content of .4 is "ready for the undertaker." According to Dr. Lykissi, some of the alcohol in Bracey's system could have been attributed to decomposition, but only as much as .14

8

percent. Dr. Lykissi said he "seriously" doubted that anyone would be able to function with a blood-alcohol content of .3 or higher.

¶22. After the prosecution rested its case-in-chief, Williams called Dr. R.W. Scales. Dr. Scales testified that he had a Ph.D. in immunology and that he was the director and owner of Scales Biological Laboratory, a DNA testing facility in Brandon, Mississippi. According to Dr. Scales, almost all of the blood stains in Williams's apartment were Williams's blood. However, Bracey's blood was found in the closet where she died, and in the left portion of Williams's kitchen sink.

¶23. Williams called Father Ollie Rencher as a witness. Father Rencher was the Assistant Rector at St. Peter's Episcopal Church in Oxford, which Bracey had attended. He also was the Episcopal chaplain to the university. Father Rencher testified that he had known Bracey and that he had counseled her in religious matters. When Father Rencher first discovered that Bracey had died, he voluntarily had contacted the Oxford Police Department and had provided a statement in which he had disclosed information about Bracey. In his statement, Father Rencher indicated that, from his personal knowledge about Bracey, he thought that she may have committed suicide. At trial, however, Father Rencher declined to testify regarding his statement, based on the priest-penitent privilege.[4]

---

[4]Because the trial court excluded Father Rencher's statement to the police regarding his initial reaction to Bracey's death, this Court does not rely on this statement in reaching its holding. This statement was never before the jury.

¶24. Williams's final witness was Dr. Arthur Copeland, a forensic pathologist with a medical degree and a Ph.D. in molecular biology. Dr. Copeland testified that he had reviewed Dr. Hayne's autopsy report and other records related to Bracey's death. Dr. Copeland disagreed with Dr. Hayne's conclusion that Bracey's body had demonstrated signs of manual strangulation. Dr. Copeland noted that Dr. Hayne did not perform a "fancy neck dissection" by which one dissects the tissues around the neck and takes photographs for a more detailed examination. Dr. Copeland testified that what Dr. Hayne concluded was hemorrhaging in the neck tissues could have simply been changes that occur with decomposition. Dr. Copeland further noted that manual strangulation produces "petechia," which he described as "small minute pinpoint hemorrhages" that appear "[l]ike a little tiny dot." Dr. Copeland went on to testify that there were no other indications of manual strangulation, such as broken fingernails or "offensive" injuries to Williams.

¶25. Dr. Copeland also criticized Dr. Hayne for not presenting his findings to another pathologist before he concluded that the manner of Bracey's death was homicide. Additionally, Dr. Copeland stated that Dr. Hayne should have requested additional investigation into whether Bracey had a history of mental or emotional treatment and that he should have contacted a forensic psychologist or a forensic psychiatrist to discuss his findings.

¶26. Dr. Copeland explained that a lack of hesitation marks does not necessarily rule out the possibility that someone committed suicide. In contrast to Dr. Hayne's testimony, Dr. Copeland testified that it is "not that difficult" to penetrate the cartilaginous portion of the

10

rib cage. Dr. Copeland testified that he could not render a conclusion as to the manner of Bracey's death, but his observations were "consistent with suicide." Dr. Copeland went on to testify that Dr. Hayne "immediately jumped the gun [and] called this a homicide from the get[-]go." On cross-examination, Dr. Copeland agreed that it is not typical for someone to commit suicide by stabbing herself with a knife. Dr. Copeland also testified that "[s]uicide among minority groups is rare."[5]

¶27. After Dr. Copeland testified, Williams rested. Williams did not testify during the trial. During the conference on jury instructions, Williams requested an assisted-suicide instruction. The circuit court refused the instruction on the basis that assisted suicide is not a lesser-included offense of murder. As previously mentioned, the jury found Williams guilty of murder. *Williams*, 2009 WL 4808181, at **1-5, ¶¶3-28.

## PROCEEDINGS IN THE COURT OF APPEALS

¶28. Before the Court of Appeals, Williams asserted that the trial court had erred when it: (1) refused his request for an assisted-suicide instruction; (2) allowed a priest to claim the priest-penitent privilege regarding conversations that the priest had had with the victim; (3) allowed Dr. Hayne to testify as an expert in the field of forensic pathology; and (4) denied his motion to dismiss based on the allegation that he had been denied a right to a speedy trial. Williams additionally claimed ineffective assistance of counsel. The Court of Appeals thoroughly addressed all issues and found them to be without merit, affirming the trial court's

---

[5]Williams is Caucasian, and Bracey was African-American.

11

judgment of conviction and life sentence for murder. *Williams*, 2009 WL 4808181, at *22, ¶82.

## DISCUSSION

¶29. On July 22, 2010, we granted Williams's petition for writ of certiorari. *Williams v. State*, 39 So. 3d 5 (Miss. 2010). Because this Court finds reversible error due to the trial court's failure to give an assisted-suicide instruction, we need not discuss the remaining issues Williams raised before the Court of Appeals.[6] M.R.A.P. 17(h); *Dora v. State*, 986 So. 2d 917, 921 n.8 (Miss. 2008).

¶30. A Lafayette County grand jury charged Williams with the murder of Bracey under Mississippi Code Section 97-3-19(1)(a) (Rev. 2006). The central issue before this Court today is whether the trial court erred by not granting Williams's request for a lesser-nonincluded instruction on assisted suicide. Mississippi Code Section 97-3-49 states:

> A person who wilfully, or in any manner, advises, encourages, abets, or assists another person to take, or in taking, the latter's life, or in attempting to take the latter's life, is guilty of [a] felony and, on conviction, shall be punished by imprisonment in the penitentiary not exceeding ten years, or by fine not exceeding one thousand dollars, and imprisonment in the county jail not exceeding one year.

Miss. Code Ann. § 97-3-49 (Rev. 2006).

---

[6]However, so there be no misunderstanding as to a potential dispositive issue discussed by the Court of Appeals, we have considered Williams's assertions concerning the denial of his constitutional and statutory rights to a speedy trial, and find them to be without merit, as discussed by the Court of Appeals. *Williams*, 2009 WL 4808181, at **17-18, ¶¶67-71.

¶31. Williams, through counsel, proffered jury instruction D-3, which stated that if the jury found Williams not guilty of murder, the jury should proceed to deliberate on whether the State had proven "the elements of the lesser crime of assisting suicide." Instruction D-3 further stated in pertinent part:

If you find from the evidence in this case beyond a reasonable doubt:

1. On or about November 13, 200[5][,] in Lafayette County, Mississippi;

2. That DEMETRIA BRACEY was a human being; and

3. That DAVID JACKSON WILLIAMS did willfully or in any manner, advise, encourage, abet or assist DEMETRIA BRACEY in taking her life;

then you shall find the defendant guilty of assisting suicide.

If the State has failed to prove any one or more of the above listed elements beyond a reasonable doubt, then you shall find DAVID JACKSON WILLIAMS not guilty of assisting suicide.

*Williams*, 2009 WL 4808181, at *6, ¶30. The trial court refused Williams's assisted-suicide instruction, reasoning that Williams was allowed an instruction on his theory of the case only if that theory involved a lesser-included offense.

¶32. However, this Court has held that a defendant is entitled to an instruction on a lesser-nonincluded offense (also known as a lesser offense) under particular circumstances. *Brooks v. State*, 18 So. 3d 833, 839-40 (¶27) (Miss. 2009) (citing *Moore v. State*, 799 So. 2d 89, 91 (¶7) (Miss. 2007)). "If a lesser offense, as opposed to a lesser-included offense, arises from the same operative facts and has an evidentiary basis, we have held the defendant is entitled

13

to an instruction for the lesser charge the same as if it were a lesser-included charge." ***Moore***, 799 So. 2d at 91 (¶7) (citing ***Griffin v. State***, 533 So. 2d 444, 447-48 (Miss. 1988)).

¶33.    Moreover, this Court has articulated the framework by which a trial court should determine whether to give an instruction for a lesser-included offense (or lesser-nonincluded offense). ***Boyd v. State***, 557 So. 2d 1178, 1181 (Miss. 1990) (citing ***Griffin v. State***, 533 So. 2d at 447). Specifically, "[i]n deciding whether lesser included instructions are to be given, trial courts must be mindful of the disparity in maximum punishments. Generally, where the disparity is great this Court has required lesser included instructions to be given." ***Id.*** If disparity in the punishments does exist, the trial judge still cannot give the instructions "on the basis of pure speculation." ***Id.*** (citing ***Mease v. State***, 539 So. 2d 1324, 1329-30 (Miss. 1989)). There must exist "some evidence regarding the lesser included offense." ***Id.***

¶34.    In discussing the lens through which a trial court should view evidence as a basis for the giving of instructions on lesser-included offenses (and lesser-nonincluded offenses), this Court has stated:

> [An] instruction should be granted unless the trial judge–and ultimately this Court–can say, taking all the evidence in the light most favorable to the accused and considering all reasonable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of the lesser included offense (and conversely not guilty of at least one essential element of the principal charge).

***Mease***, 539 So. 2d at 1330 (quoting ***Harper v. State***, 478 So. 2d 1017, 1021 (Miss. 1985)). Accordingly, we initially are to ascertain whether "some" evidence existed to support the instruction requested. ***Boyd***, 557 So. 2d at 1181 (citing ***Mease***, 539 So. 2d at 1330). If this

14

Court is able to identify some evidence in support of the instruction, this Court is not called upon to weigh this evidence with regard to the jury's verdict. *Williams*, 2009 WL 4808181, at *23, ¶86. Rather, when viewing this evidence, this Court must find that an evidentiary basis existed for the instruction unless "taking the evidence in the light most favorable to the accused, and considering all reasonable favorable inferences that may be drawn from the evidence in favor of the accused, that no hypothetical jury could find the fact as the accused suggests." *Anderson v. State*, 571 So. 2d 961, 964 (Miss. 1990) (citations omitted).

¶35. Pursuant to Mississippi Code Section 97-3-49, Williams requested a lesser-nonincluded instruction on assisted suicide and not a lesser-included offense. The disparity of maximum punishments between the charged offense and the lesser-nonincluded offense is obvious: the punishment for murder is life imprisonment, and the maximum punishment for assisted suicide is ten years in the state penitentiary. Miss. Code Ann. §§ 97-3-19(1)(a), 97-3-49 (Rev. 2006). Because the record is strewn with evidence of the interactions between Williams and Bracey before her death, the question this Court must answer is whether any of this evidence, when viewed and considered in the light most favorable to Williams, supports a jury instruction that Williams "in any manner, advise[d], encourage[d], abet[ted], or assist[ed]" Bracey to commit suicide. Miss. Code Ann. § 97-3-49 (Rev. 2006).

¶36. Evidence in the record relevant to the instruction on assisted suicide includes (1) conflicting expert testimony as to whether Bracey committed suicide; (2) evidence that Bracey and Williams were depressed individuals involved in a romantic relationship and had entered a suicide pact; (3) evidence that Williams had assisted Bracey's plans by helping her

15

liquidate her bank account; (4) evidence that Williams had assisted Bracey by purchasing beer to facilitate the enactment of their suicide pact; (5) evidence that Bracey and Williams had been at Williams's apartment in the days before the event, trying to remain undiscovered; (6) evidence that Williams had facilitated the enactment of the suicide pact by providing kitchen knives; and (7) evidence by way of Williams's statement, which was before the jury, that Bracey had stabbed herself. For the sake of today's discussion, we have combined our review of this evidence into three subheadings.

### 1. Expert Testimony

¶37.    For the prosecution, Dr. Hayne performed an autopsy on Bracey five days after her death. Dr. Hayne testified at trial that the manner of her death was homicide, not suicide, because of "(1) the angle and depth of the fatal wound, (2) the presence of injuries to Demetria's neck, (3) the absence of 'hesitation marks,' and (4) the abrasion on the back of Demetria's hand." ***Williams***, 2009 WL4808181, at *28, ¶105 (Roberts, J., dissenting). As the Court of Appeals' dissent correctly posits, however, Dr. Copeland  contradicted Dr. Hayne's findings on all points. ***Id.*** at 29, ¶¶106-111. Dr. Copeland specifically testified that his observations were "consistent with suicide."

¶38.    Dr. Lykissi testified as well for the prosecution, opining that Bracey had not taken Klonopin, contrary to Williams's statements, and that Bracey's blood-alcohol content was .6 percent.  He said he doubted anyone would be able to function with a blood-alcohol content of .3 or higher.  Importantly, however, "there was no testimony from Dr. Hayne, Dr. Earnest Lykissi, or Dr. Copeland that Bracey would have been too intoxicated to stab

16

herself." *Id.* at 27, ¶103. Accordingly, in viewing the evidence in the light most favorable to Williams, sufficient evidence exists in the record to support suicide as a possible cause of death.

*2. Suicide Pact*

¶39.  At trial, evidence of a suicide pact between Bracey and Williams became a recurring theme. On November 16, 2005, Investigator Williams of the Oxford Police Department and Sergeant Marsh of the Mississippi Highway Patrol's criminal investigation bureau interviewed Williams. Sgt. Marsh and Investigator Williams testified that (defendant) Williams had stated in this interview that he (Williams) and Bracey had "a suicide pact where they decided they were going to commit suicide." Moreover, Canankamp testified that Williams had related to her that Bracey and Williams had entered a suicide pact in which "he [Williams] was going to do himself and she [Bracey] was going to do herself."

¶40.  Also in that interview and of importance to this case, Williams presented his version of events from the night of Bracey's death:[7]

> We had kind of talked about **committing suicide together** and stuff like that and we decided we were going to do it last week and she came over, it was Sunday. We just hung out together, didn't go to class, she didn't work, um and we just hung out for a couple of days and **decided that we were going to do it** that night and she, we both drank a lot and took some pills but it wouldn't help the pain, you know. And **we decided to do it in the closet so it would take longer for people to find us if somebody showed up looking for us** and we got knives and went in there and **we decided to do it at the same time** and mine didn't go as far in.

---

[7]Again, this transcript of Marsh's interview with Williams was received into evidence during the State's case-in-chief.

(Emphasis added). The Court of Appeals' majority opinion found none of Williams's testimony sufficient to warrant a jury instruction on assisted suicide. Specifically, the Court of Appeals reasoned that Williams's version of events likely was scripted through interactions with his attorney, and that these statements indicated only that Bracey and Williams had discussed suicide. ***Williams***, 2009 WL 4808181, at *8, ¶37.

*3. Other Evidence Relevant to the Suicide Pact*

¶41.    In the same interview with authorities, other evidence arose when Williams's then-attorney involved himself in the interview process and began questioning Williams:

[Williams's Attorney]: Okay. Uh, the day, the Thursday that all of this happened, Thursday leading into Friday, tell them about going to the bank.

Williams: She wanted to go to the bank and get her money out and put it in her purse so that her mom could get it. She said she wasn't sure that she could get access to the account. So we went by the bank and took out all of her money out. I don't know exactly how much it was.

[Williams's Attorney]: It was an ATM?

Williams: Yes, it was an ATM.

[Williams's Attorney]: And which bank was that?

Williams: Trustmark on West Jackson.

[Williams's Attorney]: That was Friday?

Williams: Yes, that was Friday.

[Williams's Attorney]: And who put the card in?

Williams: I did that. She told me the pin number and I punched it in. She searched on the [I]nternet to see how much to get because she didn't know

18

what her balance was so she got pretty much all of it, I think. She told me how much it was, I don't remember.

[Williams's Attorney]: Okay. Who wound up with the money?

Williams: She did. She just put it in her purse somewhere, in like a little coin purse thing. She put it in there.

[Williams's Attorney]: Was the money still there when you left?

Williams: It should be, yeah.

[Williams's Attorney]: Okay. Now, tell them about the phone call that you received from Jessica Smith.

Williams: Jessica had been trying to call um, Demetria on her cell phone and she had turned it off because she didn't want anybody to know where she was and she called me and I thought I should answer and do something. Because she said she was worried about where she is, that she had been missing work and not going to band and all that so, I decided to tell her that she had gone down to her dad's house and I said that her dad didn't want her number given out so I did the three way calling. I told her to turn her cell phone on real quick and she turned it on. I did a three way call to Demetria's cell phone and she answered and she said that she was down at her dad's place and that her dad wasn't doing too good.

[Williams's Attorney]: Okay. When was this?

Williams: I think it was um, Thursday or Wednesday.

[Williams's Attorney]: Wednesday or Thursday?

Williams: Yeah.

. . .

Detective Williams: You said, let me verify this. You stated that Demetria wanted to take her money out of her account to make sure that her mother got the money is [sic] she went through with the suicide.

Williams: Right?

19

Detective Williams: And actually killed herself and said her mother would get the money and cut through all the red tape from having to go through the banking system to get the money.

Williams: Right. I don't know if she could get access to it through the bank, the account. I think it was tied through her school account somehow. I don't know if she could get access to it.

Detective Williams: But you are the one that took the money out?

Williams: Right. Basically it was her idea. She wanted to do it.

¶42. When considering this evidence, the Court of Appeals' majority opinion found no evidence that Williams had made an "overt act" that "caused or helped her [Bracey] to commit the physical act of taking her own life." *Id.* at *11, ¶42. More particularly, the Court of Appeals opined that driving Bracey to the bank, helping her with the ATM machine, and answering a call to lie as to Bracey's location did not rise to the level of "actions calculated to effectuate the death of another" to satisfy the language of the assisted-suicide statute, because these acts did not lead to Bracey's death. *Id.* at *10, ¶¶39-40. Further, the Court of Appeals reasoned that Bracey's death at Williams's apartment, where the two lovers had been hiding out and binge-drinking prior to Bracey's death, failed to indicate that Williams had encouraged or assisted Bracey to commit suicide. *Id.* at *10, ¶43.

¶43. We respectfully find that in reaching the conclusion that no evidence existed to warrant a jury instruction on assisted suicide, the Court of Appeals applied the facts of this case in too narrow a manner to the broad language of the assisted-suicide statute. With regard to each piece of evidence, the Court of Appeals reasoned that Williams had failed to provide

20

evidence of assistance of suicide, specifically "action on the part of the assistor that leads directly to the physical act of terminating [Bracey's] life." *Id.* at *7, ¶35.

¶44. In so doing, the Court of Appeals viewed each piece of evidence independently from the recurring evidence relating to the suicide pact and not in the light most favorable to Williams. Certainly, when viewed in isolation, taking someone to the ATM does not encourage suicide, nor does purchasing beer or telling lies. Neither the language of the assisted-suicide statute nor the evidentiary standard for a lesser-nonincluded offense, however, contemplates such a narrow application of the evidence to this case:

> A person who wilfully, or **in any manner, advises, encourages, abets, or assists another person to take**, or in taking, the latter's life, or in attempting to take the latter's life, is guilty of felony and, on conviction, shall be punished by imprisonment in the penitentiary not exceeding ten years, or by fine not exceeding one thousand dollars, and imprisonment in the county jail not exceeding one year.

Miss. Code Ann. § 97-3-49 (Rev. 2006) (emphasis added). A person is guilty of assisted suicide if "in any manner" he or she "advises, encourages, abets, or assists another person to take" his or her life. *Id.* Moreover, the evidentiary standard for a lesser-included offense requires this Court to make "all reasonable favorable inferences" in favor of Williams. *Anderson*, 571 So. 2d at 964.

¶45. In viewing the totality of the evidence in the light most favorable to Williams, we do find that Williams's statements to law enforcement, which were offered into evidence – combined with the other evidence in the record concerning the interactions between Williams

21

and Bracey – indicate that a hypothetical reasonable juror may have believed Williams's version of events.

¶46.    As Judge Roberts articulated in his dissent, when viewed in the light most favorable to Williams, the suicide pact, considered in conjunction with the other evidence, could support a conclusion that Williams did encourage and/or assist Bracey in committing suicide. For purposes of this opinion, we adopt his findings on this issue:

> The position advocated by the majority is based on the conclusion that no evidence supports the concept that Williams advised, encouraged, abetted, or assisted Demetria in committing suicide. Respectfully, the majority's position ignores the substantial evidence that Williams and Demetria had a suicide pact. By agreeing to commit suicide together, each member of the pact was *encouraged* to commit suicide because they no longer had to face the possibility of committing suicide alone. Williams and Demetria were lovers. The suicide pact could easily be interpreted as an agreement between them that "if you are going to kill yourself, I do not want to continue to live without you, so I will likewise kill myself." Williams's statement indicated that he had attempted to commit suicide, but could not muster the courage to do so. A photograph that was introduced into evidence showed that Williams had cuts on his chest, and the testimony at trial demonstrated that Williams's blood was found in numerous places in his apartment. Based on Williams's statement, he and Demetria both drank a substantial amount of alcohol to gain the courage to commit suicide. Viewed in the light most favorable to Williams, by drinking together, he and Demetria were each *encouraged* to commit suicide. It bears repeating that the statute that prohibits assisting suicide includes language that encouragement or assistance "in any manner" may be a punishable act.
>
> Additionally, there was other evidence that Williams encouraged Demetria to commit suicide. During Agent Marsh's interview of Williams, Williams stated that he and Demetria had been discussing suicide since the previous summer. According to Williams, he talked about committing suicide more than Demetria did, "but she wanted to do it with me." Williams also stated that he "probably brought it up in her mind." Additionally, a reasonable person could have also concluded that, by providing the place to commit suicide and the kitchen knives to accomplish the task, Williams assisted Demetria in committing suicide. It is necessary to remember that our task in analyzing this issue is solely to determine whether there was sufficient

22

evidence to justify a jury instruction–not to weigh the evidence. Again, a criminal defendant is entitled to a lesser-offense instruction where there is an evidentiary basis for it in the record. *McGowan*, 541 So. 2d at 1028-29.

Contrary to the substance of the majority's opinion, the assisted-suicide statute does not require that the contemplated assistance or encouragement be persuasive, direct, or significant. Assistance or encouragement "in any manner" is sufficient to constitute the crime. As previously mentioned, a defendant is entitled to a lesser non-included-offense instruction "where there is evidentiary support that a defendant is guilty of a lesser charge arising from the same nucleus of operative facts." *Green v. State*, 884 So. 2d 733, 737(¶ 12) (Miss. 2004) (citing *Mease v. State*, 539 So. 2d 1324, 1329 (Miss. 1989)). "In fact, proposed instructions should generally be granted if they are correct statements of law, are supported by the evidence, and are not repetitious." *Id.* at (¶ 13).

*Williams*, 2009 WL 4808181, *29-30, ¶¶112-114 (Roberts, J., dissenting) (footnote omitted).

¶47.    In sum, when viewed in the light most favorable to Williams, a reasonable juror could conclude that Williams and Bracey had entered into a suicide pact, an agreement whose fulfillment encouraged each party to commit suicide. With this agreement in mind, we find that a jury may have viewed the other evidence as supporting the proposition that Williams and Bracey had gone beyond mere conversations about committing suicide together. A jury may have reasoned that Williams's accompanying Bracey to the ATM, purchasing alcohol, and lying to Bracey's friend provided sufficient evidence of a suicide pact and were acts in furtherance of this pact sufficient to constitute encouragement. Moreover, the evidence also shows that Williams knowingly assisted Bracey by providing her with a knife to facilitate her suicide and a place (his closet) to commit the suicide together where their bodies would be hard to find. Consistent with this pact, Williams had marks on his body indicative of failed attempts to commit suicide. And for the sake of emphasis, we note again that the jury also

23

had before it Williams's statement that Bracey had stabbed herself. Given all this evidence, in the light most favorable to Williams, a hypothetical reasonable jury may have found the facts to be as Williams stated. *Anderson*, 571 So. 2d at 964.

CONCLUSION

¶48.    Because of the broad language of the assisted-suicide statute as well as our existing standard of review concerning whether a trial court should give an instruction on a lesser-nonincluded offense, we are constrained to find that the learned trial judge in today's case committed reversible error in failing to instruct the jury on the lesser-nonincluded offense of assisted suicide. We recognize that a trial judge's error in failing to give a jury instruction often will be deemed harmless based on the totality of the record; however, the failure to give the assisted-suicide instruction in today's case may have been the difference in a conviction for a lesser offense with a substantially lesser penitentiary sentence as opposed to a murder conviction and a life sentence. *See Brown v. State*, 39 So. 3d 890, 900 (Miss. 2010). Therefore, we reverse Williams's conviction for murder and sentence of life imprisonment in the state penitentiary, and we remand this case to the Circuit Court of Lafayette County for a new trial consistent with this opinion.

¶49.    **REVERSED AND REMANDED.**

**DICKINSON, LAMAR, KITCHENS AND CHANDLER, JJ., CONCUR. WALLER, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, P.J., RANDOLPH AND PIERCE, JJ.**

**WALLER, CHIEF JUSTICE, DISSENTING:**

¶50.    A defendant may request a jury instruction on a lesser-nonincluded offense when the evidence supports the inclusion and the lesser offense originates from common facts.  Here, I find no evidence supporting the assisted-suicide instruction requested by Williams.  His defense at trial was he did not commit murder and not that he merely assisted the victim in suicide.  Because the overwhelming facts support a murder conviction and because of the lack of a factual basis to support the lesser-nonincluded offense of assisted suicide, I respectfully dissent.

**I.    The assisted-suicide jury instruction is not supported by evidence.**

¶51.    Even viewing the evidence in a light most favorable to Williams, no reasonable jury could find him guilty of assisting suicide "without resorting to speculation or conjecture" as to the meaning of the evidence.  *Brazzle v. State*, 13 So. 3d 810, 818 (Miss. 2009) (en banc).  Williams had to demonstrate two things to avail himself to an assisted-suicide instruction – that Bracey had committed suicide and that he had helped.  The only evidence Williams presented at trial to support his assisted-suicide theory was that he and Bracey had formed a mutual agreement to commit suicide together – a suicide pact.

¶52.    The plain meaning of a suicide pact – a mutual agreement to die at the same time – does not suggest encouragement or assistance of suicide as contemplated by Mississippi Code Section 97-3-49.  *See Williams*, 2009 WL 4808181, **14-15. [8]  First, the evidence at

---

[8] "Because suicide carries a tremendous social stigma, it is tempting to assume that if two lovers decide to commit suicide, one of them has to advise or encourage the other to do so. . . . [This] is by no means a logical inference that an appellate court may take notice of in determining whether there is sufficient evidence [for an assisted suicide instruction."

trial does not support that Bracey did take her own life. Second, even if we assume she did, no evidence at trial even slightly suggested that she was encouraged or advised to act because of a mutual agreement with Williams. And he offered no evidence at trial to explain how a suicide pact encouraged or assisted her alleged suicide. Further, for us to interpret the meaning of an alleged suicide pact between these two people (*e.g.,* did she enter it because he forced her, or did she already intend to commit suicide . . .) requires a level of speculation not allowed by our law. The stated findings in the Majority opinion do not support Williams's contention that they had agreed to commit suicide. *See* Maj. Op. ¶ 46. Had they, in fact, agreed to commit suicide, it does not follow that Williams assisted or encouraged Bracey's decision simply because it occurred at his apartment and with his kitchen knife.

## II. A lesser-nonincluded-offense instruction must arise from the same facts alleged in the indictment.

¶53. Some sets of facts lend themselves to prosecution for two separate and distinct offenses. A defendant is entitled to jury instructions on a lesser-nonincluded offense when the set of facts surrounding the crime reasonably shows that the defendant is guilty of two crimes – the crime charged and the lesser-nonincluded offense -- "*without any inconsistency in evidentiary or ultimate findings. . . .*" ***Griffin v. State***, 533 So. 2d 444, 448 (Miss. 1988) (emphasis added). We explained the consistency-in-evidence requirement in ***Gangl v. State***, 539 So. 2d 132, 136 (Miss. 1989) (en banc). The lesser-nonincluded offense must "arise[] out of a nucleus of operative fact common with the factual scenario giving rise to the charge

laid in the indictment." ***Id.*** *See, e.g.,* ***Moore v. State***, 799 So. 2d 89, 90 (Miss. 2001) (child-scalding incident implicated charges for either felony abuse or misdemeanor neglect).

¶54. The indictment here alleges that Williams murdered Bracey. Thus, this becomes the operative fact from which a lesser-nonincluded offense must arise. With the operative fact in mind, we consider all the evidence presented at trial to determine if it supports the requested instruction, without an inconsistency in the ultimate findings. While we do consider the evidence in the light most favorable to the accused, we cannot ignore evidence that is inconsistent with the defense's theory or that supports the prosecution's charge. *See* ***Griffin***, 533 So. 2d at 447; ***Boyd v. State***, 557 So. 2d 1178, 1182 (Miss. 1989).

¶55. In our cases addressing lesser-nonincluded offenses, the accused has argued that he is "less culpable" by proposing jury instructions for an offense that logically would stem from the charge or from the operative facts in the indictment. *See, e.g.,* ***Griffin***, 533 So. 2d at 447 (simple assault rather than rape); ***Boyd***, 557 So. 2d at 1182 (same); ***Moore***, 799 So. 2d at 90 (misdemeanor child-neglect rather than felony child-abuse). But here, Williams's assisted-suicide instruction does not follow logically from a murder charge, and it contradicts the operative fact in the indictment. This result exceeds the boundaries and purpose of our holding in ***Griffin***.

¶56. Within the operative facts of this case, Williams cannot be guilty of both murder and assisting suicide. The proposed assisted-suicide instruction requires an irreconcilable inconsistency in the evidence and ultimate findings. A murder charge requires the prosecution to prove the defendant killed the victim. *See* Miss. Code Ann. § 97-3-19(1)(a)

27

(Rev. 2006). Conversely, assisting suicide requires the prosecution to prove the victim killed herself. *See* Miss. Code Ann. § 97-3-49 (Rev. 2006). Because Williams has not shown how his assisted-suicide instruction follows from the operative facts in the indictment and the facts shown at trial, that he murdered Bracey, he is not entitled to the instruction.

### III. When there is strong evidence of the indicted charge, the accused is not entitled to a jury instruction on a lesser-nonincluded offense.

¶57. Our cases allowing instructions for lesser-nonincluded offenses rely on the recognition that little or conflicting evidence existed on one element of the indicted crime. *Brooks v. State*, 18 So. 3d 833, 840-41 (Miss. 2009); *Griffin*, 533 So. 2d at 447; *Gangl*, 539 So. 2d at 135. Thus, we ask whether a reasonable jury could find Williams not guilty of murder. We need not make a determination on whether the jury could also find guilt for the lesser offense when there is strong evidence of the indicted charge. *See Delashmit v. State*, 991 So. 2d 1215, 1222 (Miss. 2008).

¶58. Here, the prosecution presented strong evidence of Williams's guilt for murder. Bracey had been found dead from a knife wound at Williams's apartment. Following her death, Williams covered her body to hide it from inspectors. Before he notified authorities of her death, he drank beer, watched television, played video games, and ordered pizza. Upon arrest, Williams confessed to the crime, stating "I must have done it. I was the only one there." At trial, one expert opined that, because of the angle of the knife wound, the strangulation marks around her neck, and the defensive marks on her hand, Bracey's death was a homicide. The other expert could state only that her death could have been a homicide

28

or a suicide.  However, after a review of all the evidence, not just the autopsy, no reasonable jury could have found him not guilty on any element of the murder charge.  *See Dampier v. State*, 973 So. 2d 221 (Miss. 2008); *Jones v. State*, 918 So. 2d 1220, 1234 (Miss. 2005).

¶59.    Because I would affirm the decision of the Court of Appeals, I respectfully dissent.

**GRAVES, P.J., RANDOLPH AND PIERCE, JJ., JOIN THIS OPINION.**