# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-KA-00326-SCT

*JOSHUA ARCHIE a/k/a JOSHUA LEON ARCHIE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/16/2021 |
| TRIAL JUDGE: | HON. STEVE S. RATCLIFF, III |
| TRIAL COURT ATTORNEYS: | THOMAS M. FORTNER |
| | JOHN K. BRAMLETT, JR. |
| | MICHAEL GUEST |
| | BRYAN P. BUCKLEY |
| | SCOTT E. ROGILLIO |
| | JENNIFER LYNN McGUIRE ROGERS |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: HUNTER N. AIKENS |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LADONNA C. HOLLAND |
| DISTRICT ATTORNEY: | JOHN K. BRAMLETT, JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/04/2024 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.     Joshua Archie was convicted of conspiracy and capital murder. Archie now appeals his convictions, arguing that the trial court erred by denying two of his requested jury instructions, that unauthenticated evidence was wrongfully presented to the jury, that the verdict is against the overwhelming weight of the evidence and that his trial counsel was

ineffective.  Finding no error, we affirm Archie's conviction.

## FACTS AND PROCEDURAL HISTORY

¶2.    On October 26, 2012, at about 10:45 p.m., the Ridgeland Police Department responded to a "shots fired" call at Party City on County Line Road. When police arrived, store manager Regina Blake and store employee Undra Ward informed the officers that store manager Bobby Adams had been shot.  The officers were directed to the back of the store where Adams's body was lying on the floor.

¶3.    Blake told police officers that she had been in the office preparing the nightly deposit when she heard a noise at the back of the store, went to check it out and saw Adams lying on the floor.  A masked gunman with dreadlocks was entering the employee entrance/exit door holding a gun. The masked gunman demanded money, and Ward advised Blake to comply with his demands.

¶4.    Blake testified that she, Ward and the gunman went to the office and put money in the gunman's bag. The gunman took the money, ran out of the office and fled through the employee exit.  Blake, who asked Ward to get the gunman's tag number, made it to the door just in time to see the gunman fleeing in a white SUV.  Party City employee Passion Blackmon testified that when she left her shift earlier that night, she had seen a white SUV pull up behind the store.

¶5.    Investigators suspected the robbery may have been an inside job since all the activity was in the back of the store in an employee-only area. Also, Ward's behavior, seen on the surveillance video, "was not one of being an actual victim[;]" the gunman kept the gun on

2

Blake rather than Ward, "the bigger, stronger person[;]" and while Blake "immediately threw her hands up" when the gun was pointed at her, Ward "didn't show any fright or anything" and just kept using his phone.

¶6.    Ward first denied involvement but later confessed.  Prior to trial, Ward pled guilty to second-degree murder and conspiracy, and, as part of his plea deal, Ward agreed to testify against Joshua Archie.

¶7.    Ward testified that he and Archie had gone to high school together, played on the same football team and worked together at the Party City on County Line in 2009.   In September 2012, he and Archie reapplied to work at Party City.  Ward was offered a job at the County Line store, which he accepted, but Archie was offered a job at the Flowood store, which he did not accept. Ward was working at the County Line location on the night of the incident.

¶8.    Ward testified that he planned the robbery with Archie about a week before at Archie's mother's apartment. Ward agreed that he would send Archie a text message to come to the store to commit the robbery. Ward testified that he chose the day in question because it was a busy time at the store and because he expected a lot of money to be in the registers.

¶9.    Ward recounted that the gunman entered the back door wearing all black and a mask with visible dreadlocks. Ward testified that he assumed Archie was the gunman. He testified that the gunman had a backpack, and he (Ward) helped Blake put money in the backpack and get it back to the gunman. Ward called 911 after the gunman left. Ward testified that, after the robbery, he asked Archie why he shot Adams, and Archie said he shot Adams because

3

he thought Adams recognized him.

¶10. On the evening before the murder, Rodolfo Cordova's white Chevy Trailblazer was stolen from Northpointe Apartments in Jackson. Cordova's white SUV had a gray, unpainted front passenger side quarter panel and bumper damage. Ward testified that Archie showed him the Trailblazer parked outside Archie's mother's apartment and said that is what he would use in the robbery. Ward testified that he saw the Trailblazer driving away behind Party City right after Adams had been shot.

¶11. Surveillance footage from Party City and two nearby businesses showed the stolen white SUV pull up behind Party City at 10:36 on the night of the robbery, and it showed the gunman fleeing the scene in the white SUV a few minutes later. Surveillance video from another business showed the stolen SUV drive toward Columns Apartments—where the stolen SUV was dumped—at 10:51 p.m. and showed a truck that belonged to Patricia Morris (Archie's aunt) driving away from the dump site at 11:20 p.m.

¶12. Patricia Morris, Archie's aunt, testified that her daughter Aliyah was working at Party City on the night of the shooting and that she had picked Aliyah up from work that night in her blue Dodge pickup truck. Morris testified that she then picked up Archie, who was on foot, near the SUV dump site on the night of the murder. Phone records showed that, when Archie called Morris at 11 p.m., her phone was using the tower that services an area just south of Party City, and when Archie called her again at 11:09 and 11:13, both of their phones were using a tower nearer Archie's residence.

¶13. After Archie was arrested, police obtained his DNA swab. A Mississippi Bureau of

4

Investigations crime scene analyst processed the SUV, which generated a DNA profile "consistent with the reference sample of Joshua Archie." To explain why his DNA was in the SUV, Archie claimed that Ward and another man brought the SUV by his apartment on the day of the robbery and that he drove it around the parking lot to see if he wanted to buy it.

¶14.    Archie testified in his own defense and denied any involvement in the capital murder. He testified that during the evening of October 26, 2012, the evening of the crime, he was at his mother's house where he also lived. He testified that his sister Jessica also was there. He testified that his mother was out shopping until nine or ten o'clock when she returned home with his other sister and some McDonald's that Archie had requested during a phone conversation with her. He testified that at ten o'clock, he was still home with his mother and two sisters.[1] He left home, he testified, at eleven o'clock. Before leaving, he took his four-year-old sister to her bed and woke his mother and suggested that she also go to bed. In the hour before he left home, he spoke on the phone with his aunt. He testified that he left his home on foot and that his aunt picked him up in front of a Fred's located on Old Canton Road as he was walking to a gas station down the street. His aunt took him to the house where she and Archie's Uncle Orlando lived, and Archie's uncle loaned him his car. Archie testified that he left their home around 11:30 p.m. or midnight.

¶15.    FBI Special Agent Charles Williams testified at trial, giving details of where Archie's phone was used the day before and the day of the underlying robbery. According to Agent

---

[1]Neither the mother nor the sisters testified.

5

Williams, Archie's phone contacted the tower, referred to in the record as the South Tower, at 10:27 p.m., 10:31 p.m., 10:49 p.m., 10:56 p.m., and twice at 10:58 p.m. Archie's phone contacted the South Tower again from 11:01 p.m. to 11:17 p.m. The South Tower did not reach Party City, i.e., the scene of the robbery, but it did reach Archie's home.

¶16. The jury found Archie guilty of both conspiracy and capital murder. Archie moved for a judgment notwithstanding the verdict or for a new trial, which the trial court denied. Archie appeals from the denial.

## ISSUES PRESENTED

¶17. On appeal, Archie argues the following issues:

    I.      Whether the trial court erred by refusing Archie's requested instruction on his alibi theory of defense.

    II.     Whether the trial court erred by refusing instruction D-1 on reasonable doubt.

    III.    Whether the trial court erred by admitting an unauthenticated photograph of Archie.

    IV.    Whether the verdict was against the overwhelming weight of the evidence.

    V.     Whether Archie's trial counsel was ineffective.

## ANALYSIS

### I.    Whether the trial court erred by refusing Archie's requested instruction on his alibi theory of defense.

¶18. "[T]he standard of review for the denial of jury instructions is abuse of discretion. *Newell v. State*, 49 So. 3d 66, 73 (Miss. 2010) (citing *Davis v. State*, 18 So. 3d 842, 847 (Miss. 2009)). "A defendant is entitled to have jury instructions given which present his

6

theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Hearn v. State*, 3 So. 3d 722, 738 (Miss. 2008) (quoting *Chandler v. State*, 946 So. 2d 355, 360 (Miss. 2006)).

¶19.    At trial, Archie requested the following jury instruction:

> The Court instructs the jury that Mr. Archie has raised the defense of alibi to the charges against him. Alibi means not being at the scene of the crime when the crime was committed, and it is a legal defense. In other words, Mr. Archie has asserted that he was somewhere else when the crime was committed.
>
> Mr. Archie does not have to prove beyond a reasonable doubt that he was somewhere else when the crimes were committed. The State must prove beyond a reasonable doubt that Mr. Archie was present and did commit the crime of capital murder.
>
> If you have a reasonable doubt about whether Mr. Archie was present on the date and time when this crime was committed, then you must find him not guilty.

The trial court refused Archie's requested alibi instruction.

¶20.    On appeal, Archie now asks this Court to find that the denial of the instruction was error and requests that we overrule the case law relied upon by the trial court in making its decision. A widespread belief exists among the bench and criminal bar that to assert an alibi defense and to obtain an alibi instruction, a defendant must put on corroborating evidence or call additional witnesses. The trial judge thought so, as did a unanimous Court of Appeals. *Golden v. State*, 323 So. 3d 1122, 1129 (Miss. Ct. App. 2021). Other opinions from the Court of Appeals support this view. *See Owens v. State*, 809 So. 2d 744, 746-47 (Miss. Ct. App. 2002); *Sims v. State*, 213 So. 3d 90, 101 (Miss. Ct. App. 2016).

7

¶21. Moreover, Mississippi Rule of Criminal Procedure 17.4 is also largely based on corroboration. It requires the defendant to give the State written notice of intent to assert an alibi defense. MRCrP 17.4(a)(1). This rule also requires the defendant to disclose the specific places the defendant claims to have been at the time of the alleged offense and the names and addresses of supporting alibi witnesses. *Id.*

¶22. But while corroborating witnesses are discoverable under our rules and corroboration is often mentioned when discussing alibi defenses, after thorough review, this Court's precedent shows corroboration is not always required to obtain an alibi instruction. When a defendant takes the witness stand in his or her case-in-chief at trial, subject to cross-examination, and testifies he or she was not present and was somewhere else when the crime was committed, our law says that is enough to obtain an instruction. ***Young v. State***, 451 So. 2d 208, 210 (Miss. 1984). Other states have taken a different view. *See **Manning v. State***, 500 S.W.2d 913, 916 (Tenn. 1973). The wisdom of our approach is not before the Court today.

¶23. Instead, this Court evaluates whether, in this case, Archie was entitled to an alibi instruction. While Archie may have been entitled, we find that the lack of an instruction did not affect the verdict.[2] *See **Conley v. State***, 790 So. 2d 773, 793 (Miss. 2001) ("Error is harmless if it is clear beyond a reasonable doubt that it did not contribute to the verdict." (quoting ***Chapman v. California***, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)). In

---

[2]The dissent, relying on ***Holmes v. State***, 481 So. 2d 319 (Miss. 1985), states that we hold that Archie's alibi evidence "is not strong enough to warrant the instruction." Dissent Op. ¶ 87. We clearly and explicitly state, however, that he was entitled to the instruction.

this case, the jury certainly believed beyond a reasonable doubt that Archie murdered Adams at Party City. So the jury obviously did not buy that he was at his mother's apartment or anywhere else. Because the jury believed that the State proved Archie's presence at the murder beyond a reasonable doubt and because this finding was supported by overwhelming evidence, the trial court's denial of the alibi instruction does not constitute per se automatic reversible error, regardless of the other evidence and other given instructions. Instead, this Court is "reluctant to disturb a[] jury's finding" and will only do so if, in light of the evidence, "[i]t is conceivable . . . that such an instruction might have entirely changed the verdict of the jury in this case." *Newton v. State*, 229 Miss. 267, 90 So. 2d 375, 378 (1956).

### a.    Archie presented his theory of defense.

¶24.    This is not a case in which Archie was denied the opportunity to present his defense. The jury was unquestionably aware that Archie's defense was that he was at his mother's apartment, or near there, and not at the nearby Party City store during the robbery and murder. Indeed, Archie took the stand and placed his version squarely before the jury—that he was somewhere else and not present when Adams was murdered. Archie gave details of his claimed whereabouts, though he struggled somewhat when pressed by the State.[3] And his attorney argued repeatedly that Archie was "at home" at the time of the robbery.

¶25.    Clearly, the jury rejected Archie's story, finding instead that the State proved beyond a reasonable doubt that Archie was in fact at Party City and murdered Adams. *Burrell v.*

---

[3] When cross-examined by the State and asked if he saying he was at home during the murder, Archie replied: "Based off -- I didn't just necessarily say I was at home. I was telling you what -- when he asked me about the times I'm not sure exactly what time I was there, but around that time; so I'm assuming, yes, sir."

*State*, 613 So. 2d 1186, 1191 (Miss. 1993) ("[I]t is well settled the jury is under no obligation to accept an alibi defense asserted by the accused . . . ." (quoting *Lee v. State*, 457 So. 2d 920, 924 (Miss. 1984))).

> b.    The State's evidence supports the jury's verdict.

¶26.    There is ample evidence to support the jury's conclusion, and no fair-minded juror could have arrived at any verdict other than guilty. The jury heard strong evidence that the robbery was an inside job. It occurred in a back room of the Party City store in Ridgeland in an employee-only area. The robber knew which of the several doors on the back of the strip mall to enter. Archie had previously worked at Party City. And he had worked there with his friend Undra Ward, who was working at the store that night. The two were good friends. They went to high school and played junior college football together.

¶27.    At trial, Ward testified that he and Archie had hatched the plan to rob the store. For his involvement in helping plan and carrying out the Party City robbery with Archie, Ward pled guilty to second-degree murder and conspiracy. He was sentenced to forty years in prison for second-degree murder and five years for conspiracy. Ward testified that he and Archie planned to rob the store on October 26, 2012, because it was near Halloween. They knew there would be "a lot of money at that time around holiday season." Archie's cousin was also working at the store that night. Ward said he texted Archie when to come rob the store.

¶28.    The robber drove a distinctive SUV. It had an unpainted quarter panel and right front bumper damage. The SUV pulled behind the store just as assistant manager Regina Blake

10

was preparing the nightly deposits. Blake heard a noise at the back of the store and found Adams lying on the ground near the masked gunman who had entered through a back door. Ward suggested Blake comply with the robber's demand for money. And video footage shows that the robber held his gun on the female employee Blake, not the bigger, stronger, former football player Ward, as they all walked to the office where the robber had Blake fill two bags with cash. Video shows that Ward appeared unnerved. He even continued on his phone while his coemployee was held at gunpoint. Ward testified that Archie later told him that he shot the manager Adams—who died on the ground in the back of the store—because he thought Adams had recognized him.

¶29.    Surveillance footage from Party City and two nearby businesses showed the gunman's white SUV—which was later determined to have been stolen—pull up behind Party City at 10:36 p.m., the night of the robbery and murder. The gunman, who appeared in the video to have hair in dreadlocks like Archie, fled the scene in the SUV a few minutes later. Video from another business camera showed that at 10:51 p.m., the SUV drove toward the Columns Apartments—the site where the stolen SUV was ditched. Video at 11:20 p.m. showed Archie's aunt Patricia Morris's truck drive away from the site where the stolen SUV was dumped. Morris told officers and later testified at trial she had just picked up Archie around that same time. She testified he was on foot walking down the street near the Storage Max by Old Canton Road. This was just down the road from where the SUV used in the robbery was abandoned.

¶30.    Investigators later located Archie's DNA in the stolen SUV used in the robbery. As

an expert put it, the dominant profile in the DNA mixture found on the interior of the SUV's driver's side door is "consistent with the reference sample of Joshua Archie" to the exclusion of "10 billion random unrelated persons."

¶31. A cell site analysis showed Archie's cell phone actively using a tower servicing the area where the SUV was stolen near the time of the auto theft. And Archie's cell phone pinged from the tower servicing the location where the SUV was ditched around the same time surveillance footage showed the stolen SUV driving to the dump site at the Columns apartments. Morris testified she had picked up Archie walking in that area that night. And surveillance footage from around 11:20 p.m. showed Morris's pickup truck driving near where the stolen SUV was left. In November, when Archie became a suspect, an investigator asked him for his cell phone. Archie claimed it had been stolen a week before and that his other phone was broken.

¶32. Archie denied involvement in the robbery and murder. He testified he was home at his mother's nearby apartment and had gotten tired of waiting for his aunt to pick him up to take him to a girl's house. So he walked to a convenience store to buy condoms and cigarettes. He explained to the jury that was the reason he was on foot late that night—shortly after the robbery and murder—when his aunt picked him up near where the robbery SUV had been ditched minutes earlier. While he claimed this is where he was instead of murdering Adams and robbing Party City, the jury simply did not believe him. Nor did they buy that his DNA got inside the driver's side of the robbery SUV earlier when some friends brought it over for him to test drive.

12

¶33. As discussed, Archie's version was squarely before the jury. But the jury rejected it, finding instead that the State proved he killed Adams during the robbery beyond a reasonable doubt. Again, because Archie had to be present at Party City to kill the store manager inside the store, it is clear the jury had no doubt about his presence.

### c. *The lack of an alibi instruction did not contribute to the jury's verdict.*

¶34. While the trial judge mistakenly believed Archie had to offer corroborating evidence or call additional witnesses to obtain a separate alibi instruction, the judge in no way limited Archie's trial testimony. And it is obvious that the denied instruction did not contribute to the guilty verdicts. That requested instruction read, in pertinent part:

> Mr. Archie does not have to prove beyond a reasonable doubt that he was somewhere else when the crimes were committed. The State must prove beyond a reasonable doubt that Mr. Archie was present and did commit the crime of capital murder. If you have a reasonable doubt about whether Mr. Archie was present on the date and time when this crime was committed, then you must find him Not Guilty.

¶35. The jury was properly instructed that the State bore the burden of proving Archie's guilt beyond a reasonable doubt. *See Burrell*, 613 So. 2d at 1191 (holding that, in cases in which the defendant presents an alibi, "the State does not have to prove an alibi to be untrue" but rather simply has "to prove beyond a reasonable doubt that the accused was present at the time and place testified about and that he murdered and assaulted the victim" (internal quotation mark omitted) (quoting *Forrest v. State*, 352 So. 2d 1328, 1330 (Miss. 1977))). And the judge instructed the jury that Archie was presumed innocent—that he had no burden

13

to prove his innocence.[4]  The jury was also properly instructed on the elements of the capital-murder charge—which included that to prove capital murder, the State must prove beyond a reasonable doubt that Archie killed Adams during a robbery.[5]  So the error in denying the alibi instruction was not reversible.  *Newton*, 90 So. 2d at 378 (noting the general rule that, when "the jury in other instructions has been adequately instructed as to the burden of the State to establish guilt beyond a reasonable doubt," this Court would not reverse based on the denial of a proper alibi instruction).

¶36.    More importantly, any error in failing to give an alibi instruction is harmless error beyond a reasonable doubt under the facts of this case.  This Court has held that "[a]n error is harmless only when it is apparent on the face of the record that a fair minded jury could have arrived at no verdict other than that of guilty." *Gilmore v. State*, 119 So. 3d 278, 290

---

[4]  The judge instructed:

The law presumes every person charged with the commission of a crime to be innocent.  This presumption places upon the State of Mississippi the burden of proving the Defendant guilty of every material element of the crime with which he is charged.  Before you can return a verdict of guilty, the State must prove that the Defendant is guilty beyond a reasonable doubt.  The Defendant is not required to prove his innocence.

[5] The judge also instructed:

If you find from the evidence in this case, beyond a reasonable doubt, that on or about the 26th day of 2012, Madison County, Mississippi, Joshua Leon Archie did unlawfully, willfully, and feloniously, without authority of law and with or without any design to effect death, kill and murder Robert Benjamin Adams, a human being while the said Joshua Leon Archie was then and there engaged in the commission of armed robbery, then you shall find the defendant, Joshua Leon Archie, guilty of capital murder, as charged in Count I of the indictment.

14

(Miss. 2013) (alteration in original) (internal quotation marks omitted) (quoting *Forrest v. State*, 335 So. 2d 900, 903 (Miss. 1976)). We explained that the "[r]elevant factors in determining whether error was harmless or prejudicial include 'whether the issue of innocence or guilt is close, the quantity and character of the error, and the gravity of the crime charged.'" *Id.* (quoting *Ross v. State*, 954 So. 2d 968, 1018 (Miss. 2007)). In our case, the issue of guilt is not close, and a multitude of evidence, including eyewitness evidence, supported the verdict. Of course, the crime is of the highest gravity.

¶37. The dissent contends that harmless error analysis is inappropriate.[6] But this Court has applied harmless error analysis to the denial of jury instructions on multiple occasions. *See Conley*, 790 So. 2d at 793; *Amos v. State*, 363 So. 3d 601, 607 (Miss. 2017). This Court also frequently applies harmless error analysis to issues of constitutional dimension. *See Conners v. State*, 92 So. 3d 676, 684 (Miss. 2012) (violation of the Confrontation Clause); *Walton v. State*, 998 So. 2d 971 (Miss. 2008) (admission of statement in violation of *Miranda*[7] rights). Further, other jurisdictions have made similar findings. *See People v. Spruill*, 477 N.Y.S.2d 424, 425 (N.Y. App. Div. 1984) ("In view of the overwhelming evidence of the defendant's guilt, any error resulting from the court's failure to furnish an alibi charge may

---

[6]The dissent claims that we are placing ourselves as a "thirteenth juror" and acting as if we have special insight into the minds of the twelve jurors. Diss. Op. ¶ 93. This is not correct. To adopt the dissent's view, harmless error analysis would no longer exist in the context of jury instructions. Curiously, the dissent claims that we attempt to judge the credibility of the witnesses. The jury judged the credibility of the witnesses. The dissent, however, gives no merit to the fact that Archie's alibi evidence was presented to the jury, which judged its credibility and rejected it. No special insight is necessary to determine that the jury did not buy it.

[7]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

15

be characterized as harmless beyond a reasonable doubt." (citing *People v. Crimmins*, 326 N.E.2d 787 (N.Y. 1975))); *Duckett v. State*, 752 P.2d 752, 754 (Nev. 1988); *People v. Hardy*, 418 P.3d 309, 342 (Cal. 2018). Harmless error analysis applies in this scenario.

¶38.    Archie was previously tried in 2017 and 2018, both trials ending in mistrial. The dissent references Archie's two mistrials as somehow constituting proof that there was not overwhelming evidence of his guilt in this trial.  Such an argument is disingenuous.  There were differences between this trial and the two prior trials, as well as between the two prior trials themselves.  In no way all inclusive but by way of example, both Archie's mother and Charles Rubisoff, a state digital forensic expert, testified in the first trial in 2017, but neither was called in the second or third trial.  Also, at both the 2017 and 2018 trials, a state forensic pathology expert testified about the autopsy report, but at this trial, the defense stipulated to the admission of the autopsy report. Unlike the dissent, we do not attempt to discern what was in the mind of jurors in a trial that is not before this Court.

¶39.    This majority finds that under this set of facts in this case, considering the specific evidence presented to the jury, there was overwhelming evidence of Archie's guilt.  Based on this finding, it was harmless error for the judge to deny Archie's request for an alibi instruction because "it is clear beyond a reasonable doubt that it did not contribute to the verdict." *Conley*, 790 So. 2d at 793 (quoting *Chapman*, 386 U.S. at 23-24).  Additionally, this Court is clarifying, and arguably making more lenient, the standard for a defendant to be entitled to an alibi instruction.  To reiterate, when a defendant takes the witness stand in his or her case-in-chief at trial, subject to cross-examination, and testifies he or she was not

16

present and was somewhere else when the crime was committed, he or she is entitled to an alibi instruction. *Young*, 451 So. 2d at 210. This holding does not change the fact that the error in this case was harmless beyond a reasonable doubt.

¶40. Because the unanimous jury believed the State proved beyond a reasonable doubt that Archie murdered Adams at Party City, there was no juror doubt about his presence. Accordingly, the denied instruction, in light of the given instructions and the evidence presented, did not contribute to the jury's verdict, particularly when Archie's claim not to have been present was asserted the entire trial by his attorneys and him and was contradicted by the State with strong evidence of guilt. Any error in denying the alibi instruction, under the facts of this case, is harmless beyond a reasonable doubt.

**II.    Whether the trial court erred by refusing instruction D-1 on reasonable doubt.**

¶41. The trial court refused Archie's proposed reasonable doubt instruction that read:

> The Court instructs the jury that a reasonable doubt may arise from the whole of the evidence, the conflict of the evidence, the lack of evidence, or the insufficiency of the evidence; but if it arises, however it arises, it is your sworn duty to find Mr. Archie "not guilty."

The trial court reasoned that the instruction was cumulative. Instruction C-2 was given which stated that

> The law presumes very person charged with the commission of a crime to be innocent. This presumption places upon the State of Mississippi the burden of proving the Defendant guilty of every material element of the crime with which he is charged. *Before you can return a verdict of guilty, the State must prove that the Defendant is guilty beyond a reasonable doubt.* The Defendant is not required to prove his innocence.

(Emphasis added.) The jury was also given other instructions on the elements of capital

17

murder, conspiracy, acting in concert and the lesser-included offenses of first- and second-degree murder. Each of these instructions stated that the State must prove the elements beyond a reasonable doubt.

¶42. Archie argues that D-1 should have been granted because it was a correct statement of law and because "[n]o other instruction given fairly covered the substance of instruction D-1." Archie acknowledges, however, that this Court's case law holds "that a definition of reasonable doubt is not a proper instruction for the jury; '[r]easonable doubt defines itself.'" *Fulgham v. State*, 46 So. 3d 315, 332 (Miss. 2010) (alteration in original) (internal quotation marks omitted) (quoting *Barnes v. State*, 532 So. 2d 1231, 1235 (Miss. 1988) ("Reasonable doubt defines itself; it therefore needs no definition by the court." (internal quotation marks omitted) (quoting *Boutwell v. State*, 165 Miss. 16, 143 So. 479, 483 (1932)))). Archie relies on persuasive case law to further argue that, although instruction D-1 did not attempt to define reasonable doubt for the jury, "[i]t is time for our state to come in line with the majority view, and to define reasonable doubt for our jurors." *Lett v. State*, 902 So. 2d 630, 640 (Miss. Ct. App. 2005) (Ishee, J., specially concurring).

¶43. The grant or denial of instruction D-1 was within the discretion of the trial court. Archie presents no basis to support a finding that the trial court abused its discretion by denying an instruction that was sufficiently covered by the other instructions. *Roby v. State*, 183 So. 3d 857, 874 (Miss. 2016); *Ross v. State*, 954 So. 2d 968 (Miss. 2007) ("Where a jury is adequately instructed on reasonable doubt, it is not reversible error for the court to refuse to give a defense instruction on it." (quoting *Howard v. State*, 853 So. 2d 781, 791 (Miss.

18

2003))). Defining reasonable doubt is not necessary to decide this issue on appeal, and this Court declines to do so. This issue is without merit.

### III. Whether the trial court erred by admitting an unauthenticated photograph of Archie.

¶44. "The standard of review governing the admissibility of evidence is whether the trial court abused its discretion." *Young v. Guild*, 7 So. 3d 251, 262 (Miss. 2009) (citing *Bullock v. Lott*, 964 So. 2d 1119, 1132 (Miss. 2007)). "Authentication requires evidence sufficient to support a finding that the matter in question is what its proponent claims." *Id.* (citing *Sewell v. State*, 721 So. 2d 129, 140 (Miss. 1998); Miss. R. Evid. 901(a)). "A party need only make a prima facie showing of authenticity, not a full argument of admissibility. Once a prima facie case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court." *Garcia v. State*, 300 So. 3d 945, 974 (Miss. 2020) (internal quotation marks omitted) (quoting *Walters v. State*, 206 So. 3d 524, 535 (Miss. 2016)).

¶45. At trial, Robin Harrigill, a Party City manager, testified that he remembered Archie and Ward reapplying for employment at Party City a month before the robbery. Harrigill testified that at the time, Archie was wearing his hair in dreadlocks. The State showed Harrigill a photograph of a male with dreadlocks, and Harrigill stated that the man in the photograph was Archie with his hair in dreadlocks. Then, Harrigill identified Archie in the courtroom.

¶46. When the State moved to introduce the picture into evidence, counsel for Archie objected to the introduction of the photo for lack of foundation. The State then elicited

19

testimony from Harrigill that he did not know when the picture was taken, but it was a true reflection of how Archie wore his hair at the time Harrigill had last seen Archie. Counsel for Archie renewed the objection, but it was overruled, and the picture was admitted into evidence. Counsel for Archie cross-examined Harrigill on the photograph, which revealed that Harrigill did not know when the picture was taken, who took the picture or where the picture came from, only that he identified Archie in the photograph.

¶47. On appeal, Archie argues that the photograph was inadmissible because the State failed to authenticate the photograph by producing "evidence of who took the photo, where it was taken or, most significantly, when the photo was taken." The State argues that the purpose of the photograph was to prove what Archie's hair looked like when Harrigill saw him the month before the capital murder. The State avers that Harrigill could properly authenticate the photograph because of his history with Archie—Archie was his employee, Harrigill had a good relationship with Archie and Harrigill interacted with Archie outside of the store.

¶48. This Court has held that "there is no requirement that a photograph be authenticated or sponsored by the photographer. Instead, any person with the requisite knowledge of the facts represented in the photograph may authenticate it." *Webb v. State*, 339 So. 3d 118, 128 (Miss. 2022) (citing *Jackson v. State*, 483 So. 2d 1353, 1355 (Miss. 1986)); *see Ford v. State*, 975 So. 2d 859, 867-68 (Miss. 2008). Here, Harrigill testified that the photo accurately showed Archie's deadlocks as of a month before the murder. Based on this testimony, the State satisfied its burden of making a prima facie showing of authenticity, and the evidence

20

rightly went to the jury for the ultimate determination of the weight and credibility. *Garcia*, 300 So. 3d at 974 (quoting *Walters*, 206 So. 3d at 535). The trial court did not abuse its discretion by finding that Harrigill could authenticate the photograph of Archie or by allowing the State to enter the photograph into evidence. This issue is without merit.

### IV. Whether the verdicts were against the overwhelming weight of the evidence.

¶49. This Court "weigh[s] the evidence in the light most favorable to the verdict, 'only disturb[ing] a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.'" *Little v. State*, 233 So. 3d 288, 292 (Miss. 2017) (second alteration in original) (quoting *Lindsey v. State*, 212 So. 3d 44, 45 (Miss. 2017)).

¶50. Archie argues that the State's case rests on the contradictory and impeached testimony of Ward. Archie argues that reversal for a new trial on the weight of the evidence is proper because numerous aspects of the State's key witness's testimony make "[i]t an exceedingly improbable and unreasonable story." *Cole v. State*, 217 Miss. 779, 785, 65 So. 2d 262, 264 (1953). Archie further argues that because he had an alibi, because the gunman was masked and because there is an explanation for the finding of his DNA in the vehicle, the verdict is against the weight of the evidence.

¶51. "[T]he jury is the judge of the weight of the evidence and the credibility of the witnesses." *Willis v. State*, 352 So. 3d 602, 614 (Miss. 2022) (internal quotation marks omitted) (quoting *Upchurch ex rel. Upchurch v. Rotenberry*, 761 So. 2d 199, 205 (Miss. 2000)). Based on the above harmless error analysis, this Court has reviewed the evidence

21

and finds that the verdict is not against the overwhelming weight of the evidence. Archie argued his theory of the case to the jury, and it was rejected. This issue is without merit.

## V. Whether Archie's trial counsel was ineffective.

¶52. "[G]enerally, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Ross v. State*, 288 So. 3d 317, 324 (Miss. 2020) (alteration in original) (internal quotation marks omitted) (quoting *Bell v. State*, 202 So. 3d 1239, 1242 (Miss. 2016)). Because this Court is limited to the trial court record, this Court will only rule on ineffective-assistance of counsel claims on direct appeal when "(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge." *Ware v. State*, 301 So. 3d 605, 615 (Miss. 2020) (internal quotation marks omitted) (quoting *Wilcher v. State*, 863 So. 2d 776, 825 (Miss. 2003)).

¶53. Archie argues in a pro se supplemental brief that the record supports a finding that his trial counsel was ineffective because they were concerned about an increase in COVID-19 cases, they did not call certain witnesses and they stipulated to the admission of the autopsy report and surveillance videos. The State argues that the record is insufficient for this Court to decide this issue on appeal and, in the alternative, that Archie's counsel was not ineffective.

¶54. Archie's ineffective-assistance-of-counsel claims rely on the record from the two mistrials and the trial at which he was convicted. The record before this Court is sufficient

to review the issue because it includes the transcripts of the trials. Accordingly, this Court fully resolves this issue in this appeal with a finding that for the following reasons, Archie's claim of ineffective assistance of counsel is without merit.

¶55. "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Galloway v. State*, 374 So. 3d 452, 468 (Miss. 2023) (alteration in original) (internal quotation marks omitted) (quoting *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). "To succeed on an ineffective-assistance-of-counsel claim, the defendant must show that (1) his counsel's performance was deficient, and (2) this deficiency prejudiced his defense." *Ashford v. State*, 233 So. 3d 765, 779 (Miss. 2017) (citing *Puckett v. State*, 879 So. 2d 920, 935 (Miss. 2004)). "To establish deficient performance, a defendant must show his attorney's representation fell below an objective standard of reasonableness." *Ross*, 954 So. 2d at 1003 (citing *Davis v. State*, 897 So. 2d 960, 967 (Miss. 2004)). "To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different." *Id.* at 1003-04 (citing *Davis*, 897 So. 2d at 967). "'The Court strongly presumes that counsel's conduct falls within the wide range of reasonable professional assistance, and the challenged act or omission might be considered sound trial strategy." *Ross*, 288 So. 3d at 324 (internal quotation marks omitted) (quoting *Swinney v. State*, 241 So. 3d 599, 613 (Miss. 2018)).

      a.    *COVID-19 Concerns*

23

¶56.    Archie's counsel filed a motion five days before trial requesting a continuance due to "an alarming, substantial increase in positive cases of the COVID-19 virus, in particular the Delta variant." Archie's counsel informed the court that, due to his age, medical situation and Archie's unvaccinated status, he was requesting to be allowed a continuance or to withdraw as Archie's counsel. The judge stated that although he sympathized, because of the "late nature" of the request, including the fact that there had been two mistrials, the motion was denied.

¶57.    Archie argues that this Court should presume he was prejudiced by the performance of his counsel. Archie states that his counsel had a conflict of interest—"counsel was faced with the obstacle of trying to protect himself from what he believed was detrimental, (COVID-19) and represent the Appellant effectively, protecting his fundamental rights while he was unvaccinated[.]" Archie claims that his trial counsel's fear of COVID-19 resulted in a failure of his counsel to present material witness testimony and his counsel's agreement to stipulations to the admission of evidence to quickly resolve the trial. Archie, however, presents no basis in the law or in the record for this Court to find that his counsel was deficient simply because he was concerned about COVID-19.

b.    *Failure to Call Certain Witnesses*

¶58.    "Counsel's choice of whether to call witnesses and ask certain questions falls within the ambit of trial strategy and cannot give rise to an ineffective assistance of counsel claim." ***Bell v. State***, 879 So. 2d 423, 434 (Miss. 2004) (citing ***Jackson v. State***, 815 So. 2d 1196, 1200 (Miss. 2002)).

¶59.    First, Archie argues that his trial counsel should have called his mother, Cherry Price, to testify in support of his alibi defense.  At the first trial, Price had testified to her whereabouts on the night of the murder and that Archie had been at home with her that evening.  Price's testimony shows that she fell asleep around 10 p.m. and did not know until the following morning that Archie had left the house.  This Court finds that Archie's representation was not deficient in not calling Price.  Price did not testify to knowing where Archie was at the time of the murder at 10:38 p.m.  Further, Price knew the following morning that Archie had left the house, but she did not know when, which supports the State's case as much as Archie's defense.  This Court cannot say that Price's testimony would have changed the outcome of Archie's trial.  *See Ross*, 954 So. 2d at 1003-04 (quoting *Davis*, 897 So. 2d at 967).

¶60.    Archie also argues that his trial counsel should have called Charles Rubisoff, a digital forensics expert for the State, to testify that there is no proof of the exchange of texts between Ward and Archie.  Rubisoff's testimony at the first trial was that he had extracted information from Ward's phone from the time of the crime, and no messages between him and Archie were present.  The evidence, however, showed "several deleted communication events that were iMessages[.]"[8]  Rubisoff clarified that "while we can review the call detail records and receive phone calls and we can see SMS messages and MMS messages being sent, we cannot see iMessages."  Rubisoff was not called in the second or third trial.

¶61.    Archie claims at Rubisoff's testimony corroborates his version of the events that he

---

[8]Rubisoff explained that an iMessage is a text message between iPhones.

25

and Ward were not conspiring together. Archie also argues that it would contradict Ward's testimony that the plan was for Ward to send a text message to Archie when it was time to rob the store.

¶62. This Court finds that Archie's counsel was not ineffective for not calling Rubisoff. Ward testified that he deleted text messages after the robbery before his phone was searched. Rubisoff's testimony, while possibly helpful to Archie, also corroborates Ward's testimony. The decision to call Rubisoff falls within trial strategy, and Rubisoff's testimony offers very little exculpatory value.

    c.  *Stipulation to the Admission of the Autopsy Report and Surveillance Videos*

¶63. Archie argues that his counsel's stipulation to the admission of the autopsy report and surveillance videos was done to "further shorten the length of the trial" and to prevent counsel from being further exposed to COVID-19.

¶64. Archie argues that the admission of the autopsy report without cross-examination motivated the jury to convict him because the report stated that the victim was killed by homicide. Archie gives no support in case law or evidence for this argument, and this Court finds it to be without merit. ***McClain v. State***, 625 So. 2d 774, 781 (Miss. 1993) (quoting ***Smith v. Dorsey***, 599 So. 2d 529, 532 (Miss. 1992)). The jury saw the surveillance camera video of Adam's being shot by a masked gunman. Whether Adam's death was a homicide was not in dispute.

¶65. Archie further argues that his counsel was deficient for stipulating to the authenticity of the surveillance camera footage instead of requiring the State to introduce witnesses to

authenticate the surveillance video footage acquired from four different locations. Archie notes that the surveillance videos had incorrect times on them and that no one testified as to how they had been merged/stored on a disc. Again, Archie cites no authority for this argument, and this Court finds it to be without merit. *Id.* (quoting *Smith*, 599 So. 2d at 532). Donald Martin, a Ridgeland detective testified to the collection, compilation and authenticity of the videos. Archie's counsel cross-examined Blackman on the times listed on the videos. Archie's counsel was not deficient.

¶66. "Only where it is reasonably probable that, but for the attorney's errors, the outcome would have been different, will we find that the counsel's performance was deficient." *Dartez v. State*, 177 So. 3d 420, 423 (Miss. 2015) (quoting *Holly v. State*, 716 So. 2d 979, 989 (Miss. 1998)). "Perfect representation in hindsight is not the standard, and the accused is not entitled to errorless counsel." *Davis*, 897 So. 2d at 966 (citing *Stringer v. State*, 454 So. 2d 468, 476 (Miss. 1984)). Archie has failed to show that by committing any of these supposed errors his "attorneys' representation fell below an objective standard of reasonableness." *Id.* at 967. Archie's claim of ineffective-assistance-of-counsel is without merit.

## CONCLUSION

¶67. Finding no error, this Court affirms Archie's convictions.

¶68. **AFFIRMED.**

**RANDOLPH, C.J., MAXWELL, BEAM AND GRIFFIS, JJ., CONCUR. COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND KING, P.JJ., AND ISHEE, J.**

**COLEMAN, JUSTICE, DISSENTING:**

**I.        Mississippi law *requires* an alibi instruction in the instant case.**

¶69.    Mississippi law *requires* the giving of an alibi defense jury instruction as long as the record contains evidence supporting it.

> "Alibi" as a defense is well established in our criminal jurisprudence. We have held many times that alibi testimony, if believed by the jury when considered along with all the other evidence, requires acquittal. *Without question*, one who interposes an alibi as the theory of his defense, and presents testimony in support of such a plea, *is entitled* to a jury instruction focusing upon such a theory.

*Young v. State*, 451 So. 2d 208, 210 (Miss. 1984) (emphasis added) (quoting *Sanford v. State*, 372 So. 2d 276, 278 (Miss. 1979). It is worth restating. If the jury believes the alibi evidence, it *must* acquit. However, lest the claiming of an alibi be confused with an affirmative defense, we have held that it is not required that the jury believe the alibi evidence, but that it is enough that the evidence create reasonable doubt as to guilt in the minds of the jurors. *Pollard v. State*, 53 Miss. 410, 423-424 (1876). Hence the importance of giving an alibi instruction when supported by testimony.

¶70.    Archie testified in his defense. He testified that during the evening of October 26, 2012, the evening of the crime, he was at his mother's house, where he also lived. He testified that his sister Jessica was also there. He testified that his mother was out shopping until nine or ten o'clock when she returned home with his other sister and some McDonald's that Archie had requested during a phone conversation with her. He testified that at ten o'clock, he was still home with his mother and two sisters. He left home, he testified, at eleven o'clock. Before leaving, he took his four-year-old sister to her bed and woke his

28

mother and suggested that she also go to bed. In the hour before he left home, he spoke on the phone with his aunt. He testified that he left his home on foot and that his aunt picked him up in front of a Fred's located on Old Canton Road as he was walking to a gas station down the street. His aunt took him to the house where she and Archie's Uncle Orlando lived, and Archie's uncle loaned him his car. Archie testified that he left their home around 11:30 p.m. or midnight.

¶71. FBI Special Agent William Charles Williams testified at trial giving details of where Archie's phone was used the day before and the day of the underlying robbery. According to Agent Williams, Archie's phone contacted the tower, referred to in the record as the South Tower, at 10:27 p.m., 10:31 p.m., 10:49 p.m., 10:56 p.m., and twice at 10:58 p.m. Archie's phone contacted the Southern Tower again from 11:01 p.m. to 11:17 p.m. The Southern Tower did not reach Party City, *i.e.*, the scene of the robbery, but it did reach Archie's home. In other words, Special Agent Williams's testimony supports Archie's alibi because it shows that Archie's phone was being used in an area that excludes the location of the crime but includes Archie's home.

¶72. Again, alibi testimony, if it creates reasonable doubt, requires acquittal, and a defendant who presents alibi testimony is entitled to an alibi instruction. *Young*, 451 So. 2d at 210. Archie gave alibi testimony, buttressed in part by Special Agent Williams's testimony that his phone was used during the robbery while connected to a tower that excludes the possibility that it was at Party City. Accordingly, the trial judge erred by refusing an alibi instruction, and Archie's conviction should be reversed, and the case should

29

be remanded for a new trial.

>        II.     **The failure to give the alibi instruction cannot be determined to be harmless error.**

¶73.    However, the majority does not reverse. While the majority holds that the trial court erred by not giving the instruction, the majority goes on to also hold that the error was harmless. Because the majority fails to consider Archie's evidence in the light most favorable to him as required by precedent, and in light of the conflicting testimony in the trial court, I cannot agree that—beyond a reasonable doubt—the failure to give the required alibi instruction was harmless.

¶74.    The State tried Archie twice before the instant trial resulted in his conviction. In both trials, mistrials were declared by the trial court because, even in the face of what the majority describes as the State's overwhelming evidence of guilt, the juries could not reach unanimous verdicts. In both previous trials, the court provided the juries with alibi instructions. The majority describes the evidence in the instant case as so overwhelming that no fair-minded jury could have reached a verdict. That two times previously the State's evidence resulted in mistrials should be the death knell to the majority's harmless error holding. The record shows that a fair-minded juror could indeed discern grounds for reasonable doubt in the evidence; they have already done so. I need not, as the majority charges, read the minds of those jurors. It is true that we cannot know their thinking when they considered the State's evidence and determined that reasonable doubt as to Archie's guilt existed; it is enough that they did.

¶75.    The reasons that the majority goes astray in holding the error here was harmless

30

continue.

¶76.    Harmless error analysis is wholly inappropriate here.  In *Davis v. State*, 18 So. 3d 842 (Miss. 2009), the court reversed the conviction because the trial court failed to instruct the jury on the defendant's theory of the case.  *Id.* at 850 (¶ 22).  The court did engage in a brief discussion of harmless error, but it was *dicta* and amounted to nothing more than a suggestion of what might happen in some future case *Id.* at 849-50 (¶ 22).  The clear holding of *Davis* was that, when the defendant presents admissible evidence in support of his theory of the defense and the jury's consideration of the evidence "could have been the difference between [a defendant] being found guilty . . . or not," the defendant is denied his right to a fair trial.  *Id.* at 850 (¶ 22).  In *Davis*, the defendant's theory of defense instruction, as we all agree of Archie's alibi instruction, was "supported by the evidence and was not mentioned anywhere else in the instructions."  *Id.* at 849 (¶ 21).  "Because it was not addressed in jury instructions, the defendant suffered an injustice."  *Id.*  The majority's holding in today's case cannot be squared with the holding in *Davis*.

¶77.    Of the cases it does cite in which we applied harmless error analysis to the failure to give a jury instruction, none apply.  In *Conley v. State*, 790 So. 2d 773 (Miss. 2001), the Court wrote that the trial court may have erroneously denied the defendant's requested instruction on culpable negligence in a murder trial.  *Id.* at 70.  However, the error was harmless because the jury's conviction of the defendant rested on the underlying kidnaping charge.  *Id.* at 793 (¶ 72).  Accordingly, *Conley* has no value in deciding the issue presented here.  In *Amos v. State*, 363 So. 3d 601 (Miss. 2017), the Court followed an earlier case,

31

*Jones v. State*, 203 So. 3d 600 (Miss. 2016), in holding that the failure to give an instruction concerning accomplice testimony was harmless error. *Amos*, 363 So. 3d at 607 (¶ 26). The instruction at issue in *Amos* was not an instruction on the defendant's theory of the case, nor did the Court have to weigh and make credibility determinations regarding competing testimony to conclude the error was harmless. *Id.* at 607-08 (¶¶ 28-30).

¶78. In the absence of any support and, indeed, as detailed here in the face of binding precedent that precludes the majority's holding, the majority turns to a few cases from California, Nevada, and New York. In *People v. Spruill*, 477 N.Y.S.2d 424 (N.Y. App. Div. 1984), the defendant did not request an alibi instruction or object when the trial court did not provide one. *Spruill*, 477 N.Y.S.2d at 424-25. Moreover, the *Spruill* Court's opinion provides no description of Spruill's alibi evidence, if indeed there was any. The only characterization of any alibi evidence was the Court's pithy characterization of the alibi evidence, if any, as "less that 'air-tight.'" *Id.* at 425. Like the majority here, the *Spruill* Court's holding also rested in part on the argument that other, correct instructions given by the Court made up for the lack of an alibi instruction, but that argument was expressly rejected by the United States Supreme Court. *Bird v. United States*, 180 U.S. 356, 361-62 (1901).

¶79. That the alibi instruction must be given even with other correct instructions is also supported by the next case cited by the majority, *Duckett v. State*, 752 P.2d 752, 754 (Nev. 1988) ("Although alibi instructions may, to some extent, merely be a reiteration of other instructions, they are not totally redundant.") In *Duckett*, a jury convicted the defendant of

32

the gruesome double murder of his uncle and his wife. *Id.* at 753. The witness against the defendant, a granddaughter of the victim who had been in the home during the crime, testified that she heard one of the victims shout out the defendant's first name. *Id.* at 753. She further testified that, as she and her younger sister were fleeing the home, she saw the defendant look over his shoulder at her and was able to identify him. *Id.* To counter the state's evidence, Duckett testified that he had been at the home of two friends during the murders. *Id.* Both friends testified at his trial that he had indeed been with them. *Id.* The *Duckett* Court held that the testimony of the young eyewitness, even in the face of testimony from two witnesses who testified they saw the defendant elsewhere and the defendant himself, was so overwhelming as to render the failure to give the alibi instruction harmless error. *Duckett* is not persuasive and flies in the face of, among other of our cases, *Holmes v. State*, 481 So. 2d 319, 321 (Miss. 1985), discussed more fully below.

¶80. As the United States Court of Appeals for the Fifth Circuit has written, "A defendant is *always entitled* to have his theory of the case, if it could amount to a lawful defense, fairly submitted to the consideration of the jury." *United States v. Flom*, 558 F.2d 1179, 1185 (5th Cir. 1977) (emphasis added).

> It is, of course, *an absolute right* of an accused to have every lawful defense he asserts, even though based upon meager evidence and highly unlikely, to be submitted as a factual issue to be determined by the jury under proper instruction of the court. *This Court will never permit an accused to be denied this fundamental right.*

*O'Bryant v. State*, 530 So. 2d 129, 133 (Miss. 1988) (emphasis added) (citations omitted). The meaning of the above-quoted language from *O'Bryant* could not be more clear, and the

33

majority's harmless error analysis constitutes an egregious affront against it.

¶81. "Error is harmless when it is trivial, formal, or merely academic, and not prejudicial to the substantial rights of the party assigning it, and where it in no way affects the final outcome of the case . . . ." ***Cath. Diocese of Natchez-Jackson v. Jaquith***, 224 So. 2d 216, 221 (Miss. 1969) (quoting 5 Am. Jur. 2d *Appeal and Error* § 776 (1962)). Our cases, cases from the United States Supreme Court, and the Fifth Circuit all establish that the right to have the jury instructed on the defendant's theory of the case is fundamental—even, as the ***O'Bryant*** Court put it, absolute. From the start, the denial of that right to Archie is prejudicial to his substantial rights, and it cannot be harmless.

¶82. Throughout its harmless error analysis, the majority views the evidence in the light most favorable to the State and treats Archie's alibi evidence as though it cannot be believed. The majority errs by doing so. The correct approach in considering alleged error in the context of refusing a jury instruction on the defendant's theory is to consider the evidence in the light most favorable to the defense.

> The instruction may be denied only if the trial court can say, *taking the evidence in the light most favorable to the accused*, and considering all reasonable favorable inferences that may be drawn from the evidence in favor of the accused, that no hypothetical reasonable jury could find the fact as the accused suggests.

***Anderson v. State***, 571 So. 2d 961, 964 (Miss. 1990) (citing ***King v. State***, 530 So. 2d 1356, 1359 (Miss. 1988)); *see also* ***Williams v. State***, 53 So. 3d 734, 741 (Miss. 2010) (reversing murder conviction for failure to give assisted-suicide instruction).

> We do not intend to characterize the case for the defense as either strong or weak. That is unnecessary, for "in criminal cases the defendant is entitled to

34

have presented instructions relating to a theory of defense for which there is any foundation in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility. He is entitled to have such instructions even though the sole testimony in support of the defense is his own."

*Tatum v. United States*, 190 F.2d 612, 617 (D.C. Cir. 1951) (citations omitted); *United States v. Young*, 464 F.2d 160, 164 (5th Cir. 1972)).

¶83. Below I address the specific arguments raised by the majority in its harmless error analysis, but pursuant to *Anderson* and the myriad cases in which we describe the entitlement of a defendant to an instruction to the jury on his theory of defense, the entire analysis of the majority is fundamentally flawed. Throughout its opinion the majority extolls the strength of the State's evidence and ignores Archie's. Accordingly, the very foundation of the majority's holding is fatally flawed.

> A. *The majority cannot conclude that the error was harmless without first weighing the credibility of Archie's testimony. In doing so, the majority violates the longstanding prohibition against judges weighing the credibility of testimony.*

¶84. In *Holmes v. State*, 481 So. 2d 319, 321 (Miss. 1985), the trial judge refused the codefendants' proffered alibi instructions stating, "The court has seriously considered the granting of an alibi instruction for both defendants, and based on the evidence that was presented, *the court does not feel that there was strong enough evidence to justify an alibi instructions*." As the *Holmes* Court wrote, the trial judge rejected the instructions not because of any problems with the wording but because of the trial judge's opinion that the evidence in support of them was weak. *Id.*

¶85. Citing the well-established principle that "*the jury is the sole judge of the weight and*

35

*credibility of the evidence*[,]" *id.* (emphasis added) (citing *Fairley v. State*, 467 So. 2d 894, 902 (Miss. 1985), the *Holmes* Court held the trial court erred by refusing the instruction. *Id.* at 322. "The trial judge should have allowed the jury to determine the weight and credibility of the conflicting testimony. To refuse the defendants' alibi instructions was error and requires reversal." *Id.*

¶86.     Today's case, much like *Holmes*, presents a dispute about the weight of the evidence. Archie testified on his own behalf and gave detailed testimony about his whereabouts on the night of the crime, including whom he saw and to whom he spoke. A jury could see the testimony from Special Agent Williams as corroborating at least in part Archie's testimony.

¶87.     Today, the majority acts in direct contravention of *Holmes*. All nine of us agree that Archie's alibi evidence warranted the giving of the alibi instruction. The five who hold the error harmless cannot reach their conclusion that no reasonable, properly instructed juror would have found reasonable doubt of Archie's guilt without first weighing Archie's alibi evidence and finding it lacking. In other words, the majority, like the trial judge in *Holmes*, holds that the evidence of his alibi simply is not strong enough to warrant the instruction. The majority characterizes its conclusion as resting on the strength of the State's evidence, but the State's evidence is contradicted by Archie's.

¶88.     The majority dismisses the above discussion of *Holmes* by miscasting it as an argument for why the instruction was warranted and writing that the majority agrees that it was warranted. Maj. Op. ¶ 23 n.2. The majority misses the point. *Holmes* directly contradicts the majority's holding that the refusal of the instruction was harmless error

36

because in order to reach the conclusion that it is, the majority must commit the same mistake that the trial judge in *Holmes* did. It must determine that Archie's alibi evidence is so weak as to not have had any chance of being effective. The majority uses harmless error as a rhetorical tool to do that which *Holmes* holds is error—deny a required jury instruction by concluding that it is too weak to overcome the State's stronger evidence.

¶89. The majority's holding, and for that matter the *Duckett* holding from Nevada cited by the majority and discussed above, cannot be squared with *Holmes*. The majority's use of harmless error analysis reaches the result that *Holmes* forbids, *i.e.*, refusing a required alibi instruction because the court believes the alibi evidence is weaker and less credible than the State's evidence of guilt.

¶90. At its core, *Holmes* stands for the well-settled proposition that the jury is the sole arbiter of credibility. While *Holmes* presented the alibi-instruction issue and, therefore, is directly on point here, it is hardly the only case in which we have written that the jury alone weighs credibility. In *Gavin v. State*, 473 So. 2d 852 (Miss. 1985), addressing the defendant's contention that the trial court should have excluded his incriminating statement, the Court wrote as follows:

> We sit as an appellate court, and as such are ill equipped to find facts. Pragmatically speaking it is essential that we have from our trial courts findings of fact upon which we may rely, for, if we had to find the facts anew in every case coming before us, we would become even further bogged down in the dispatch and management of our caseload. Beyond that, even if we wanted to be fact finders, our capacity for such is limited in that we have only a cold, printed record to review. The trial judge who hears the witnesses live, observes their demeanor and in general smells the smoke of the battle is by his very position far better equipped to make findings of fact which will have the reliability that we need and desire.

37

***Gavin***, 473 So. 2d at 955 (citations omitted). "[E]very accused has a fundamental right to have her theory of the case presented to a jury, even if the evidence is minimal." ***Stuart v. State***, 369 So. 3d 545, 551 (¶ 21) (Miss. 2023) (internal quotation marks omitted) (quoting ***Chinn v. State***, 958 So. 2d 1223, 1225 (¶ 13) (Miss. 2007)).

¶91. Of more recent vintage, in ***Anderson v. State***, 361 So. 3d 609 (Miss. 2023), we considered the defendant's contention that the guilty verdict against him was against the overwhelming weight of the evidence. The Court wrote, "The jury is the sole judge of the weight and worth of evidence and witness credibility." ***Anderson***, 361 So 3d at 618 (¶ 32) (internal quotation marks omitted) (quoting ***Williams v. State***, 305 So. 3d 1122, 1130 (¶ 22) (Miss. 2020)). Because we as an appellate court have no business making credibility determinations, when considering whether the evidence is against the weight of the evidence we must view all evidence in the light most favorable to the guilty verdict. ***Id.***

¶92. In considering whether the sufficient evidence undergirded the guilty verdict in ***Eubanks v. State***, 341 So. 3d 896 (Miss. 2022), the Court wrote as follows:

> [W]hen the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony. This wise rule applies with equal force to the state's witnesses and the appellant's witnesses, including the appellant himself. We have repeatedly held that in a criminal prosecution the jury may accept the testimony of some witnesses and reject that of others, and that they may accept in part and reject in part the evidence on behalf of the state or on behalf of the accused. In other words, the credibility of witnesses is not for the reviewing court.

***Eubanks***, 341 So. 3d at 911 (¶ 48) (quoting ***Gathright v. State***, 380 So. 2d 1276, 1278 (Miss 1980)).

¶93. I could go on; the cases in which we have admonished that the jury is the sole judge

38

of credibility are legion. Here, I need only return to **Holmes**. **Holmes** is directly on point and refutes the majority's rationale in today's case. It does not matter how weak the trial judge (or, by extension, appellate judges) thinks the alibi evidence is as compared to the State's. If it is admissible evidence of an alibi, the jury must be properly instructed so that it—not the judge or judges—can do its job and judge the credibility of the competing evidence. It is impossible for the majority here to reach the conclusion that Archie's alibi evidence could not create reasonable doubt in the minds of a properly instructed juror without weighing its credibility against the State's evidence and finding it not to be credible. Doing so is not our job, and I cannot agree that, beyond a reasonable doubt, no properly instructed juror could find reasonable doubt in light of Archie's alibi evidence. The majority would sit as the "thirteenth juror" and declare that it has special insight into the minds of the twelve jurors in the trial below—that it somehow knows what effect proper instruction would have had on the jurors. **Bush v. State**, 895 So. 2d 836, 844 (¶ 18) (Miss. 2005), *overruled by* **Little v. State**, 233 So. 3d 288, 292 (¶ 19) (Miss. 2017). The Court rejected the notion that appellate courts take the role of the thirteenth juror when we overruled **Bush** in **Little**. The majority would make the same mistake anew, even going so far as to note that Archie struggled on cross-examination—a point only relevant to his credibility. Maj. Op. ¶ 24.

> B.      *As a matter of law, it is not sufficient that Archie was able to present evidence of his alibi and his attorney was able to argue the alibi to the jury; the instruction from the Court was required.*

¶94. The majority holds the failure to give the jury instruction was harmless in part because Archie was allowed to present and argue his alibi evidence, but Mississippi law and

precedent from the Supreme Court of the United States require more. The defendant is entitled to a *jury instruction* that adequately instructs the jury on his theory of the case. *Hearn v State*, 3 So. 3d 722, 738 (¶ 45) (Miss. 2008) (quoting *Chandler v. State*, 946 So. 2d 355, 360 (¶ 21) (Miss. 2006)). The majority relies on the fact that Archie's attorney argued his alibi defense, but argument by counsel cannot take the place of a warranted jury instruction. *Taylor v. Kentucky*, 436 U.S. 478, 488-89 (1978).

> Petitioner's right to have the jury deliberate solely on the basis of the evidence cannot be permitted to hinge upon a hope that defense counsel will be a more effective advocate for that proposition than the prosecutor will be in implying that extraneous circumstances may be considered. It was the duty of the court to safeguard petitioner's rights, a duty only it could have performed reliably.

*Id.* at 489 (citation omitted). That Archie was allowed to present evidence and that his attorney argued the evidence is not enough. *Only the trial court* can safeguard a defendant's rights by instructing the jury. *Id.*

¶95. The majority cites no authority whatsoever to support the proposition that a jury instruction is not required or the failure to give a jury instruction is harmless error when the defendant is allowed to present and argue his defense. The lack of such authority makes sense because if it were true, the need to review the erroneous refusal of a jury instruction on appeal would never arise. Every case in which the instruction was wrongly refused would have evidence to support the instruction; if no evidence supports it, then the refusal would not be in error. *Nelson v. State*, 284 So. 3d 711, 716 (¶ 18) (Miss. 2019) (trial judge may refuse a requested defense instruction that is not supported by evidence). As a corollary wholly inconsistent with the law, it is impossible to envision a case after today that would

be reversed for the improper denial of a defendant's instruction if it is to be considered harmless error because the defendant presented evidence and argued the issue to the jury.

¶96.   Finally, the United States Supreme Court long ago rejected the contention that the failure to instruct the jury on the defendant's theory of the case can be cured by other instructions. ***Bird v. United States***, 180 U.S. 356, 361-62 (1901).

> It has sometimes been said that if the judge omits something, and is not asked to supply the defect, the party who remained voluntarily silent cannot complain. But such a principle cannot apply to the present case, because the judge's attention was directly called by the government's request to the question of self-defense, and because the defect in that request was then and there pointed out by the defendant's counsel in their exception. The question involved in that instruction was a fundamental one in the case; indeed, it may be said that the defendant's sole defense rested upon it. The defendant, as shown in the bill of exceptions, had testified to his own belief that his life was in danger, and to the facts that led him so to believe; but by the instruction given the jury were left to pass upon the vital question without reference to the defendant's evidence.

***Id.*** at 361-62 (citation omitted).

> C.   *The argument that the error is harmless because the jury found Archie guilty is tautological and without any authority to support it.*

¶97.   In the end, much of the majority's holding rests on markedly circular reasoning. Because the jury found Archie guilty, the error must be harmless. Maj. Op. ¶ 37. If the jury finding a defendant guilty proved that error was harmless, then all error appealed following a conviction would be harmless. The majority's argument amounts to a holding that a guilty verdict cures the erroneous refusal of a jury instruction, but no case law can be found to support it. Moreover, it ignores the importance of the trial court's role as the only entity that can safeguard the defendant's right to have the jury properly instructed. ***Taylor***, 436 U.S. at

488-89.

## CONCLUSION

¶98.    The majority invades the province of the jury by determining that the State's witnesses were more credible and that the State's evidence was stronger than Archie's testimony and, as a result, finds that no fair-minded juror could conclude that reasonable doubt as to Archie's guilt exists.  The majority's holding directly contradicts our holding in ***Davis***, a case with no meaningful distinction from today's case in which we held harmless error analysis to be inappropriate.  The majority's holding contradicts ***Holmes***.  Accordingly, and with respect, I dissent.

**KITCHENS AND KING, P.JJ., AND ISHEE, J., JOIN THIS OPINION.**